AULTMAN, MILLER & CO., PLAINTIFFS IN ERROR, V. MICHAEL LEAHEY, DEFENDANT IN ERROR.

1. **Trial:** MOTION FOR A NEW TRIAL: QUESTIONS CONSIDERED BY TRIAL COURT. A question raised and presented only by a motion for a new trial, made after the expiration of three days after the verdict or decision, or by an amendment made after such three days to a motion previously filed in any case not specially excepted by the provisions of section 316 of the code, should not be considered by the trial court, and if it is, such consideration will not be held binding by this court.

2. **The Evidence** considered, and *Held*, To sustain the verdict and judgment.

ERROR to the district court for Cuming county. Tried below before CRAWFORD, J.

*M. McLaughlin* and *C. C. McNish*, for plaintiffs in error.

*Wilbur F. Bryant* and *Thomas M. Franse*, for defendant in error.

COBB, J.

This action was brought on error from the district court of Cuming county.

The plaintiffs filed their petition December 6, 1884, in the court below, as an incorporated company under the general statutes of Ohio, engaged in manufacturing agricultural implements and machinery at Akron, Ohio.

They allege that, on July 23, 1884, by their agent, J. E. Melcher, they sold and delivered to the defendant, at his instance and request, one "Buckeye Cord Binder," for two hundred and thirty dollars; that the same was worth that sum; that the defendant agreed to pay that sum for the same, which he has failed and refuses to do, for which suit is brought.

The defendant answered, denying, generally and specially, that the plaintiffs were a corporation doing business as alleged, or that the "Buckeye Cord Binder" described was worth the sum alleged, and set up that it was of no value whatever.

There was a trial to a jury, with a verdict for the defendant and judgment against the plaintiffs for costs.

The plaintiffs' motion for a new trial was heard in the court below and overruled, and the case brought here on the following assignments:

I.   The verdict is not sustained by sufficient evidence.

II.   The verdict is contrary to law.

III.   The verdict is contrary to the first, second, third, and fourth instructions of the court to the jury.

III.   For errors of law occurring at the trial, which were excepted to by the plaintiff.

The first attention to be paid to the assignments is that of the plaintiffs' application to the court below for a rehearing.

It appears from the record that the motion was formally made December 15th, after the verdict and before judgment; that on the 18th, following, the plaintiff moved to amend the motion for a new trial, by interlining and inserting the following words and figures: "III. The verdict is contrary to the 1st, 2d, 3d, 4th of the instructions of the court," which amendment was granted, and which was excepted to by the defendant. It is thus that two separate assignments appear as No. 3, which is only significant of an irregularity to be inquired into, under the exception to it by the defendant. Is it such an irregularity as to preclude its consideration under the motion for a new trial?

Section 316 of the civil code of procedure provides that, "the application for a new trial must be made at the term the verdict is rendered, and, except for the cause of newly discovered evidence, shall be within three days after

the verdict was rendered, unless unavoidably prevented."
This amendment embodies a new and definite assignment
of error. It was not made until the fourth day after the
verdict was rendered, after the expiration of the time
limited by the code, without the finding by the court that
the plaintiff "was unavoidably prevented" from a compli-
ance with the statute, as a palliation for the amendment.
Is it not, therefore, to be rejected? If it may be said that
the application was made within the statutory limit, and
that the right of amendment to pleadings is inherent in
the court, rendering this amendment consubstantial with
the original assignments, it may also be suggested that the
amendment was an apparent necessity in bringing the
application within the rule that, "the trial court be specifi-
cally called to each alleged error, in a motion for a new
trial, and the same be also specifically pointed out to the
supreme court in the petition in error," and without which
the original allegations were too incomplete and insufficient
to support the vague contentions of error presented
to the court. The amendment comprised substantially
the whole of error assigned. It does not seem, there-
fore, to have been competent for the court to have ex-
tended the time limited by the code, by the allowance
of a substitute, as an amendment, after the expiration of
the three days appointed, after the verdict. The authority
of the legislature to regulate, by the code, applications for
new trials, will not be disputed. It has done so in a man-
datory provision. This amendment is no less than an
infraction of it. It is an improper suspension of the rule
of the code to counsel, "be ye also ready."

This opinion was expressed by this court, in a like case,
as early as the October term, 1877, in the action of *Fox v.
Meacham*, 6 Neb., 530, when it was held that the statute
requiring a motion for a new trial to be made within three
days after the rendition of the verdict (except on newly
discovered evidence), is mandatory; and if the motion is

afterwards made, it is of no avail to the party filing it. This authority is deemed sufficient to overrule the third assignment as to the specific errors of the separate instructions to the jury.   There is other authority to support it. It was so ruled in *Munch v. Williamson*, 24 Cal., 170, under section 1182 of the code of that state, and in *Williams' Case*, 5 Mo., 254.

But when we further examine the instructions to the jury, in the light of the evidence adduced, there would seem to be no sufficient grounds for a new trial from error, partiality, or unfairness of instructions.

The cause of complaint is evidently the verdict of the jury rather than the ruling of the court, who charged as follows:

"I.   The plaintiff brings its action to recover the sum of $230 with interest at seven per cent from July 21st, 1884, which it alleges is due it from the defendant for a reaper sold and delivered to defendant.   Plaintiff also alleges that it is a corporation duly organized and existing under the laws of the state of Ohio.   The defendant denies that the plaintiff is a corporation as alleged, but admits the sale and delivery of the reaper, and at the agreed price as alleged in the petition, but alleges that the reaper was entirely worthless, and hence is not liable for the price agreed upon, and ought not to be required to pay anything because of the worthlessness of the reaper, and these are the issues you are to try and determine.

"II.   The burden of proof is upon the plaintiff, and it must satisfy you, by a fair preponderance of the evidence, that it was and is a corporation as alleged in the petition, and if it has failed to do so it cannot recover in this action.

"III.   The burden of proof is upon the defendant, and he must satisfy you, by a fair preponderance of the evidence, that the reaper was worthless, before he can defeat a recovery in this action, having admitted the sale and purchase, and price agreed to be paid.   The plaintiff is entitled to

recover unless the defendant has shown by the evidence that the reaper was of no value, as alleged.

"IV.   If you find from the evidence that the defendant had an opportunity to and did inspect and try the reaper before purchasing it, or if after trying the machine he purchased it, then he is liable for the agreed price, whether the machine was good or bad, unless it afterwards proved or turned out to be worthless by reason of some defect that was concealed or not perceptible at the time of purchase; but if the purchase was made before trial, then defendant will not be liable for the agreed price, if, upon a fair trial, and without fault of the defendant, the machine proved to be worthless."

The question remaining to be considered is, that of the weight of evidence to the jury, or, is the preponderance of testimony for the plaintiff, and against the verdict, so clear, obvious, and decided that the judgment should be reversed?

The defendant contends that when a trial court overrules a motion for rehearing, the verdict of the jury will not be set aside, if there is evidence to support it.

The proper rule was authoritatively expressed in the opinion delivered by the chief justice, in *Roberts v. Swearingen*, 8 Neb., 372, that "the finding of the court, when substituted for a jury, is entitled to the same weight as a verdict ; that the mere difference of opinion between court and jury will not warrant setting the verdict aside; but where either is clearly wrong, the result should be set aside, and that such had been the uniform holding by this court from our organization as a state." By this rule the inquiry is to be made of the weight and preponderance of the evidence, and the impropriety of the verdict.

The plaintiff, on the trial, first introduced the testimony of the witness McCarger—that he resided at Council Bluffs; was acquainted with the plaintiff, who resides at Akron, Ohio; that plaintiff's business is the manufacture and sale of the Buckeye harvester, reaper, and mower; that these

machines were sold in 1884 by J. E. Melcher, at Wisner, Nebraska; that Melcher was the agent of plaintiff for Wisner and vicinity that year; that witness was the general agent for the state of Nebraska.

The original certificate of association of Aultman, Miller & Co., under an act to provide for the creation and regulation of incorporated companies, and to create and regulate manufacturing companies in the state of Ohio, passed May 1, 1852, was introduced and admitted in evidence, to which the defendant excepted.

The witness Melcher followed, and testified, substantially, that he sold the McCormick and Buckeye binders, mowers, and table rakes for Aultman, Miller & Co., Akron, Ohio, in 1884, at Wisner, Nebraska; that he sold to the defendant, on July 23, 1884, a Buckeye binder. That was the date that it was closed up, but there was some talk of a sale before that date. The agreement between defendant and witness was, that he should pay $100 cash, and $135 in notes; that witness was to give him $10 worth of twine, which would put the machine at $235; then there was to be $5 discount, if he should pay the $100 cash, otherwise it was $240 for the machine. The defendant said that would be all right, if we could make everything work all right. If he took the machine out and found out that it did good work he would keep it. It was taken out and tried. We tried it, says the witness, two rounds, on a piece of oats first, and then took it into a wheat field, and made two rounds there. He was perfectly satisfied with the work the machine did that day. He said that it was better than he ever expected the machine to work in that kind of grain. After it was through cutting witness said, "Then I will expect you to keep the machine." To which he replied, "Yes, I will keep the machine here." This was after the trial was made.

On cross-examination the witness further testified that the first talk with defendant about this machine was May

1, 1884, when defendant came in and talked of buying a mower and hay rake for $100, payable October 1st, but it was paid before that time.  He said he was going to buy a binder, and if we would make him the mower and rake at $95 he would give us the first chance on ·the binder. The next conversation was just before the field trial came off, in the shoe-shop of Jorgan, who was present.  Witness said to defendant, "I have your machine all ready to take out with you." He replied, "I have never bought a binder of you; I expect to get one of Mr. Cones," when witness said, "That is a funny way to treat me; you have been an old customer of mine, and I have been selling to you all the time, and I would like to have a chance of selling you a binder." He then replied, "I have heard so much from Mr. Cones and his machine that I believe the Deering is the best machine." Witness said, "I would like to have a chance to show my machine alongside of the Deering, or any other in the field, and would like to sell you one." Witness told him that it would do as good work as any other machine, to which defendant replied, "If you will do that it is all right; I will take back what I said about the Deering."

Q.  Didn't you say that you would show it to be better than any other machine, or you would not ask him to take it?

A.  Yes, sir; or any other machine.  It would not make any difference whose machine it was.

Q.  Didn't you tell him, in order to make the bargain as good as to buy the Deering, that you would throw in $10 worth of twine?

A.  It was at the time I was driving 'out to start the machine that I promised him ten dollars' worth of twine.

Q.  Didn't you afterwards take pay for that twine, in money?

A.  Yes, sir.  He claimed that he would not pay for the machine, but would pay for the twine.  I took the

money, because the twine I had to pay for out of my own pocket, and the binder I didn't have to.

Q.   When you went out there, as stated, did you not go for the purpose of trying the machine, for the purpose of letting the defendant see which he liked the best?

A.   Yes, sir; because the defendant had promised me that if the machine did as good work as the other he would buy of me.

Q.   Who was there on the ground besides yourself, the defendant, and your brother Fred?

A.   There were quite a number, probably about fifty farmers.

The defendant was sworn and examined as a witness, and testified that he was fifty-three years of age; that he has known the witness Melcher one year, the first of April last; that defendant has been a farmer for twenty-seven years, and has harvested grain with machinery for the last seventeen years.

Q.   State whether you are acquainted with the Buckeye cord binder or reaper the plaintiff's witness testified to bringing to your farm for the purpose of trial, and state, if you know, the value of it, and of what practical use it was?

A.   I am well acquainted with it; I don't know its value; it was of no use to me.

Q.   Did you make a trial of the machine on your farm?

A.   Yes; we tried the machine and found it didn't work to satisfaction, and sent word to Melcher, and he sent Herman Lase out; then it failed to do its work. We tried it day after day, and Melcher came out. We had it there eight or nine days, and there was not a day, except one, but he or his man was there to see the machine and try to make it run. He kept telling me there, from day to day, that he would make it all right. He admitted that he knew there was something wrong with the machine, and once I asked him what he was going to do about it—that all I asked

was to make it do one fair and square day's work, and then I was satisfied with it. He said he knew there was something wrong with it, but for me to work it, and work away, and he would send to the company and tell them about it, and see what was the matter, and then he would fix it all right. After awhile he came out and said: "I have heard from the company, and they say that there must be some part of the machine that is put together wrong, but I am satisfied that the machine is put together all right. It is the fault of your grain that you are trying to cut; no cord binder in the world will cut that grain. If you will get any machine in the world that will cut that grain, and bind it, the McCormick wire binder excepted, I will make you a present of that machine." Witness said, "I don't want it as a present; I would not take it as a present." He said he would be pleased if I would get a machine that I could try in this grain and be satisfied with it, to which I replied that I didn't want my grain to go uncut, and that he could see now how we have butchered it for the last ten acres. He said, "You know that no twine binder that you can get can cut that grain; there is no twine binder made that can cut it."

Witness then went and hired his neighbor, Homer Graves, with his machine, and he came and cut the grain.

Q. State whether or not you made a trial with this Buckeye cord binder at the time Mr. Graves was cutting your grain?

A. Yes, my son did; right behind a Deering reaper, and it stuck on the fifth bundle. Homer Graves run the Deering reaper. It was right in the same swath after it; he cut from morning till noon without skipping one single bundle on that piece of grain.

Q. How did the Buckeye machine act at the trial?

A. When it came to lift over the grain, before it came down on the binder, it would choke right up there and stick.

Q.  Would it bind the bundle?

A.  It could not, for it would not let the grain down on the binder.  It would choke up there, all the time, before it would get the grain down on the binder.  We spent about nine or ten days cutting what ought to have been done in four, and we had to pay for cutting part of grain then.

Q.  Who was handling this machine?

A.  My oldest boy; it was the first self-binder he ever drove, but he has run reapers and mowers for me since he was nine years old.

Q.  Did Homer Graves take any part in this trial?

A.  No.  I hired him to cut the grain.

Q.  State whether or not you offered to take the machine back to Mr. Melcher, or to carry it where he wanted you to?

A.  Yes, sir, I told him how Mr. Graves cut the grain without ever so much as sticking, and asked if, under the circumstances, should he expect me to keep that machine? He said, "He didn't see how he could take it back, it would leave him in a bad fix, and would lose his agency by it." Witness said, "It would be a benefit to the public if he should." He said he would like to compromise it, and wanted to guaranty that the machine would be good another year and do good work.  He offered the guaranty of the company to that effect, which witness declined to accept. Witness paid him $20 for the twine, and offered to pay him for every hour of time he had lost by it.  Witness denied that he ever at any time told the agent, Melcher, that the machine worked satisfactorily.

Frank Leahey was sworn, examined, and testified as a witness, that he is a son of the defendant, has harvested with machinery and mowers since he was nine years old; drove the team on the trial of this machine, which was the first binder he had ever run; the second day after the trial he cut wheat with this machine, which cut some and

missed a good many bundles, and choked a good deal if any weeds or good heavy grain got into it.

Q.   How many bundles did it miss?

A.   In every round from three to nine or ten, and a dozen in some rounds.   It might go an odd round without missing any.

Q.   What, if anything, did you do when the machine worked in this way?

A.   I went according to instructions, changing my reel and the binder, and moving the butter, and so on.

Q.   Who came out there to see the machine?

A.   Herman Lase and J. E. Melcher came there several times.   Father sent for them, and I left orders myself several times to send for them.   Mr. Melcher came the second or third day after the trial, when he was sent for, and tinkered around the machine a good deal.   I didn't understand exactly what he did do; he said he changed several things.

Q.   Where was you, and what doing?

A.   I was in the field trying to run the binder; myself and brother, who drove the lead team.   I was on the binder all of the time.

Q.   State whether or not, on July 25th, at your father's farm, in his presence, you heard J. E. Melcher, the agent of the plaintiff, use the language, "I know there is something wrong with that machine, I cannot make it work, I have written to the company and told them about it," referring to the machine in question, or did he use words to that effect?

A.   I heard him say so.

Herman Lase was sworn, examined, and testified as a witness, that he knows the defendant and J. E. Melcher; was working for the latter in 1884 at the time the machine in question was taken to the defendant's place during harvest season; was out there during that time; saw the machine started, and saw it at work in the field, and saw it

the second day after the trial, stopped and saw that it was not working all right, nor getting along well.

Q.  State to the jury how it worked?

A.  It kept missing the bundles; I should judge from four to a dozen or so on a round.  Sometimes it didn't miss but two or three, and sometimes one, and then, again, it would miss probably a dozen.

Q.  Was there anything else wrong with it?

A.  There was a spring that was not working right on the knotter; I went out next morning and put in a new spring as a workman of Mr. Melcher.  I saw it a number of times; in the first it bothered with the binder, the binder would skip bundles; at the last it kept choking up in the elevator.

Q.  How many times did you see it?

A.  From thirty to forty times, could not state exactly how many.

Q.  Did the machine at any time you saw it there do good work?

A.  It did pretty fair work the first time we tried it for a new machine, afterwards it didn't.

Q.  Were you able to fix it to do good work?

A.  No, sir.  I worked at something or another, to see what was the fault of it, every time I went out there.

Q.  Was there something the fault with the machine?

A.  Certainly there was; the binder was imperfect and didn't bind every bundle.  I could not set it.  I tried every way imaginable.  Towards the last it choked up in the elevator, and I could not stop it.  I have worked on harvesting machines the last four harvests.

Homer Graves was sworn and examined as a witness, and testified that he knew the defendant, lives two and a half miles distant from him; lived there in the summer of 1884; is a farmer, was raised on a farm; has seen a great many wheat and oat fields, have raised both, and have cut and seen others cut grain; saw the machine in question

work at a distance, as it was trying to follow witness up.

Q.   What kind of binders have you seen work?

A.   I have seen the Deering work, and the Buckeye work.

Q.   What experience have you in running a binder?

A.   Ever since I have been here; for three seasons.

Q.   In what condition did you find the fields of grain cut by this machine in controversy?

A.   I didn't see any fields cut by it, only the one I went and finished up; the wheat field; they came in and undertook to follow me around the piece; I was there and saw it.

By the Court:   Did you see the machine cut the field that you are talking about?

A.   No, sir.   I saw it try to cut part of it.

Q.   How did it cut this little part that you saw?

A.   It cut it and left it in great big piles; they had to pile it out of the way before they could get around it.

Q.   How many times did you see them try that machine?

A.   I told them to come there behind me and try the machine, and it might work, but they only went one or two rounds, and their machine did not work.   It choked up; the grain was scattered where they took it out, and would not bind.   I was driving on ahead, and would look around, purposely, to see if they were stopped or coming on.

E. G. Maher was sworn and examined as a witness, and testified that he is twenty-nine years of age; resides in Wisner; is acquainted with the defendant; was at his place during the harvest of 1884; saw the Buckeye cord binder at work there, and noticed that it would not tie the bundles; it scattered the grain; witness was there probably half an hour, as an insurance agent, to insure the defendant.

*Cross-examined:* Noticed probably a dozen or more bundles that it had missed; he stopped and tried to fix it; said it would not work. It dropped off the loose bundles and scattered them on the ground.

The plaintiff's counsel submitted, in argument, that "the purchase of the machine having been admitted in pleading, it devolved on the defendant to prove it was worthless, to avoid recovery."

The court narrowed the trial to that issue, and so instructed the jury. The testimony presented shows the conditional terms of sale, and also the implication to the jury in support of the verdict. It was admitted by the salesman, the plaintiff's agent, that the machine in controversy was to be as good as any other—"that he could show it to be better than any other machine, no difference whose it was"—as an inducement for the trial and purchase of it. Other circumstances tend to prove that the sale was conditional, and that the expressed conditions were not accomplished. The payment for the twine contributed as a substantial element of the sale, and the new conditions of guaranty proposed are not significant of an unconditional sale. The interest of the agent in an absolute sale, and the bias of the defendant against the machine itself, or the conditional purchase of it, were facts for the jury in weighing the evidence of each. The testimony of four credible witnesses corroborative of the defense set up left an implication of the worthlessness of the machine in support of the verdict.

In view of the evidence as to the facts of the sale, and of the practical inutility of the machine on trial and in controversy, there does not appear to be such a preponderance of testimony in favor of the plaintiff in error as to justify the reversal of the judgment. Neither does it appear that the verdict was clearly wrong. In an estimate of the value of agricultural machinery the verdict of a jury would seem

to be entitled to respect, unless ample reasons were shown to the contrary.

The judgment of the district court is affirmed.

JUDGMENT ACCORDINGLY.

THE other judges concur.