## HALL OIL COMPANY, ET AL. v. BARQUIN, ET AL.*
(No. 1041; June 2, 1925; 237 Pac. 255)
Rehearing denied Oct. 5, 1925 without opinion.

Appeal and Error—Motions—Res Adjudicata—New Trial—
Courts—Motion for Judgment Notwithstanding Verdict—Trial
—Instructions—Mines and Minerals—Judgment—Trespass—
Punitive Damages—Exemplary Damages.

1. Under rule of court, nothing which could have been prop-
   erly assigned as ground for new trial in court below will
   be considered in proceeding in error, unless it is properly
   presented to trial court by motion for new trial, which
   was overruled and exception thereto reserved, all of which
   must be embraced in bill of exceptions.
2. Remedy by motion, as defined by Comp. St. 1920, § 5714,
   is generally confined to incidental matters in progress of
   a cause, and is appropriate only in absence of remedy by
   regular pleadings, and is not available to dispose of mer-
   its of case.
3. Strict rule of res adjudicata does not apply to motions, and
   trial court may in its discretion allow such motion to be
   renewed, subject to rules against abuse of privilege.
4. Motion for new trial, under Comp. St. 1920, § 5870, differs
   from an ordinary motion for incidental relief, in that

time within which it may be made or filed and what shall constitute a cause are prescribed and limited by statute, and it may be a condition precedent to appellate review.

5. Court is not controlled by principles of practice established in other jurisdictions, unless they are more reasonable and consonant with other rules of our procedure, either judicially established or prescribed by statute.

6. Second motion for new trial may be filed within 10 days prescribed by Comp. St. 1920, § 5870, after first motion has been denied without first obtaining leave of court, and trial court has discretion to regulate practice to guard against abuse.

7. Motion for new trial may be filed after judgment is rendered on verdict.

8. Whether motion is strictly one for new trial, under Comp. St. 1920, § 5870, is to be ascertained not only from its face, but also from record, what its real purpose was, and how it was understood and treated by parties and trial court.

9. Motion "to set aside the verdict" because verdict for punitive damages is excessive and not justified by evidence, because verdict for compensatory damages is not supported by evidence and is excessive, and because verdict was received in absence of defendants and their attorneys, and jury discharged without opportunity by defendants to have it polled, *held* not strictly motion for new trial, under Comp. St. 1920, § 5870.

10. That motion "to set aside the verdict" on specified grounds was not in fact motion for judgment, notwithstanding verdict, and might have been overruled as having no clear standing in our practice, *held* insufficient to justify declaring it to be motion for new trial, within Comp. St. 1920, § 5870.

11. Motion for judgment, notwithstanding verdict, does not prevent making of subsequent motion for new trial, under Comp. St. 1920, § 5870.

12. Under Comp. St. 1920, § 5870, it is duty of trial court to grant new trial, when evidence is insufficient or verdict is contrary to law, and motion is timely made on that ground, without conditioning right thereto on request for directed verdict, in view of section 5867.

13. Legal sufficiency of evidence at trial is tested by motion or request for directed verdict, and not by demurring to evidence, or by motion for nonsuit or dismissal.

14. In action for trespass, instruction, that actual damages claimed were "based on presumption" that plaintiffs were injured by defendants' acts, *held* not misleading as declaring, as legal presumption, that plaintiffs were injured, or that they were entitled to damages.

15. Admissions by defendants in their answer to former action by plaintiffs to cancel oil and gas lease, under which they claimed that lease was void ab initio, and judgment therein declaring lease void, *held* to show that entry on land and drilling of oil well thereon was trespass, entitling plaintiffs to recover actual damages in absence of consent or acquiescence therein.

16. Admissions by defendants in answer to former action by plaintiffs to cancel oil and gas lease, that lease was void ab initio, and judgment therein declaring lease void, *held* binding on defendants therein and, under Comp. St. 1920, § 5644, were binding on corporation which contracted with defendants to develop lands.

17. Evidence *held* to warrant finding that defendants, claiming to act under oil and gas lease, entered on premises and drilled well with reckless disregard for, or wilful indifference to, plaintiffs' rights, warranting submission to jury of allowance of punitive damages.

18. There are two kinds of malice; malice in fact and malice in law.

19. Where defendants, over plaintiffs' protest, entered on plaintiffs' land and drilled oil well thereon, regardless of their legal rights under void lease, plaintiffs were entitled to punitive damages, even if defendants believed lease gave them legal right to enter.

20. Though allowance of punitive damages is generally left to jury's discretion, under Comp. St. 1920, § 5870, a new trial may be granted on ground that such damages are so excessive as to show that they are result of passion or prejudice.

21. Theory, on which punitive or exemplary damages are allowable, is that of punishment of offender and warning to others.

22. Exemplary damages of $1, assessed against individual defendant for entering on plaintiffs' land as employee of corporate defendant, claiming under void oil and gas lease and drilling oil well thereon, *held* not excessive.

23. Exemplary damages of $1,080, assessed against corporate defendant for entering on plaintiffs' land and drilling oil and gas well thereon, under void oil and gas lease, *held*

not so excessive as to indicate passion or prejudice, where actual damages assessed against all three defendants greatly exceeded such amount.

24. Corporation, which claimed right to drill oil well on plaintiffs' land under oil and gas lease, with notice that plaintiffs' claimed lease was void, and which accepted responsibility for entry and drilling of well by another corporation under contract to develop land for it, *held* chargeable for exemplary damages to same extent as latter corporation for statements by latter's superintendent, as to purpose of going on land and intention to complete well, notwithstanding plaintiffs' protest.

25. Though financial condition of defendant may be considered in determining exemplary damages, they may not be assessed against two defendants respectively solely with reference to difference between respective amounts representing their wealth.

26. That one of two corporate defendants, equally chargeable for entering on plaintiffs' land and drilling oil well thereon, was assessed $1,080 as exemplary damages, while other was assessed $23,928 on basis of difference in their financial condition, *held* alone sufficient to indicate verdict was result of passion and prejudice against latter corporation.

27. Exemplary damages should bear some reasonable relation to amount of actual damages, as well as be reasonably commensurate with nature and cause of offense.

28. In assessing exemplary damages, jury may consider not only defendants' financial condition, but also character and extent of injury, as well as character of act causing injury and matters of aggravation.

29. Punitive damages, of more than $25,000, for entering on plaintiffs' land and drilling oil well thereon, over plaintiffs' protest, amounting to nearly 3 times value of entire property, and 20 times amount of actual damages assessed, *held* so excessive as to show passion and prejudice, and reduced to $9,000.

30. Objection to instruction, as misleading not called to trial court's attention, will not be considered on appeal.

31. As respects punitive damages, better rule is to abstain from instructing that they may be allowed within limits of amount claimed by petition especially where amount claimed is much beyond any possible reasonable expectation of recovery.

32. Instruction, that punitive damages might be allowed within limits of amount claimed in petition, *held* not so prejudicial as to require reversal, where amount allowed was much less than amount claimed in petition.

33. Better rule is to omit from instruction, relative to punitive damages, any statement that such damages may be allowed "without regard to actual damages."

34. Appellee may reap no advantage from adverse rulings of trial court, unless he presents them on appeal by properly assigning them as law and rules of court direct, and this rule applies to defendant in error in error proceedings.

35. Where single act of trespass and entry on plaintiffs' land and drilling oil well thereon, under void oil and gas lease, was act of three defendants, there could be but one recovery of damages.

36. Where defendant oil corporation entered on plaintiffs' land and drilled oil well thereon over plaintiffs' protest under contract to develop land for another corporate defendant, under void oil and gas lease, regardless of legal rights and relying on their assumed superiority over legal rules and ability to respond in adequate damages, *held* that punitive damages, somewhat larger than would ordinarily be allowed, were justified.

*See Headnotes (1) 3 C. J. pp. 960, 968, 969; 4 C. J. pp. 94, 96, 97; (2) 28 Cyc. pp. 3, 4; (3) 34 C. J. p. 884, 28 Cyc. p. 20; (4) 29 Cyc. pp. 721, 759, 927; (5) 15 C. J. p. 925; (6) 29 Cyc. p. 927; (7) 29 Cyc. p. 728; (8) 29 Cyc. p. 942; (Anno) (9) 29 Cyc. p. 942 (Anno); (10) 29 Cyc. p. 942 (Anno) (11) 29 Cyc. p. 726; (12) 29 Cyc. pp. 832, 833; (13) 38 Cyc. pp. 1541, 1551, 1563; (14) 38 Cyc. p. 1748; (15) 27 Cyc. pp. 637, 639 (Anno) (16) 34 C. J. p. 1009 (17) 27 Cyc. p. 640; (18) 38 C. J. p. 345; (19) 38 Cyc. p. 1146; (20) 17 C. J. p. 994; 29 Cyc. p. 842; (21) 17 C. J. pp. 968, 969; (22) 27 Cyc. p. 640 (23) 27 Cyc. p. 640; (24) 17 C. J. p. 989 (25) 17 C. J. pp. 995, 996 (Anno) (26) 17 C. J. p. 996 (Anno) (27) 17 C. J. p. 995; (28) 17 C. J. p. 995; (29) 27 Cyc. p. 640; (30) 3 C. J. p. 850; (31) 17 C. J. p. 1082 (Anno) (32) 4 C. J. p. 1043; (33) 17 C. J. p. 1082; (34) 3 C. J. p. 1404; (35) 38 Cyc. p. 1162; (36) 27 Cyc. p. 640.

Error to District Court, Fremont County; Ralph Kimball, Judge.

Action by James Barquin and another against the Hall Oil Company and others. Judgment for plaintiff and defendants bring error. The material facts and points in controversy are fully stated in the opinion.

*John D. Clark, Hagens & Murane* and *Frederick D. Anderson* for plaintiffs in error.

The alleged trespass occurred while defendants held a lease on the premises, though the lease was subsequently decreed to be void.   Punitive damages are not allowable for acts under a supposed right and without malice; Philadelphia B. & W. R. Co. v. Green (Md.) 71 Atl. 986; Jopling v. Co. (W. Va.) 29 L. R. A. (N. S.) 814; Rhyne v. Turley, (Okla.) 131 Pac. 695; Kibler v. So. Ry. (S. C.) 40 S. E. 556; Gwynn v. Co. (S. C.) 48 S. E. 460; 2 Sutherland (4th ed) 1288; West. Union Co. v. Reeves (Okla.) 126 Pac. 216; Phelps v. Owens, 11 Calif. 23 Inman v. Ball (Iowa) 22 N. W. 668; Lyles v. Perrin (Cal.) 51 Pac. 332; Kuehne v. Allen, 148 Fed. 666; Barry v. Edmonds, (U. S.) 29 L. ed. 733; Phil. Co. v. Quigley (U. S.) 16 L. ed. 77; M. St. P. Ry. Co. v. Arms (U. S.) 23 L. ed. 374; L. S. & M. C. R. R. Co. v. Prentice, (147 U. S.) 101; Kestor v. Wagner, 22 Wyo. 516; the lease was not void except as to the homestead value; Jones v. Losekamp, 19 Wyo. 83; the Midwest Co. was obligated under its lease from the Hall Oil Co. to commence drilling within a fixed time and its failure to do so would have subjected it to damages for not protecting the lease. Exemplary damages are not allowable in the absence of malice; 2 Sutherland (4th ed.) 1288; West. Union Co. v. Westmorland (Ala.) 44 So. 382; C. R. I. P. Ry. Co. v. Whitten (Wis.) 119 S. W. 835; Unfried v. Libert, (Ida.) 119 Pac. 885; malice in such cases is defined in State v. Johnson, 7 Wyo. 510; plaintiff made no case for punitive damages; Yazoo & M. V. R. Co. v. Hardie, (Miss.) 34 L. R. A. (N. S.) 740; the judgment between the same parties is not judicata as to other controversies between the same parties; 15 R. C. L. 450-469; Moser v. Phil. H. P. R. Co. 40 L. R. A. (N. S.) 519; it is impossible to determine from the decree, upon which of two or more of the issues involved the judgment was entered; it was not therefore conclusive; Russell v. Place, 4 Otto (U. S.) 606, 24 L. ed. 214; Wentworth v. Co. (Wis.) 74 N. W. 551; Matson v. Poncin (Ia.)

132 N. W. 970; Berenio v. Co. (Calif.) 61 Pac. 958; Watts v. Watts (Mass.) 23 L. R. A. 187; Routh v. Board Commissioners (Kans.) 113 Pac. 397; Clifton v. Meuser, 129 Pac. 159; the parties to the two suits were not the same; the first was a suit in equity for cancellation of a lease; the second a suit at law for trespass; it is uncertain as to which of the findings judgment was rendered. Instructions numbered 2, 4 and 5 were erroneous; their effect was to lead the jury to believe that it was their duty to award punitive damages.

*John J. Spriggs* for defendants in error.

The appeal should be dismissed; there were two motions for new trial; the petition in error is insufficient; the Barquin lease was void on account of a prior lease; the 2nd motion for new trial had no standing; the first motion having been overruled; Wolbol v. Steinhoff, 168 Pac. 251; State v. Kimes, 20 O. C. D. 403; a motion to vacate a judgment is a motion for new trial; 5870 C. S. Floyd v. C. F. & I. Co., 50 Pac. 864; U. S. F. & G. Co. v. Nash, 124 Pac. 269; Hartley v. Chidister, 13 Pac. 578; Morgan v. Keller, (Mo.) 92 S. W. 75; Reid v. Filmore, 12 Wyo. 72; the substance and not the form of a motion governs; Stanton v. C. B. & Q. Ry. Co., 165 Pac. 993; Campbell v. Weller (Wyo.) 164 Pac. 881; motion for directed verdict was not renewed at the close of the evidence. The first motion was for a new trial; Barnhil v. Miller, 217 Pac. 274; the second motion contains no new matter. Jurors cannot impeach their verdict; Pullman v. Finlay (Wyo.) 125 Pac. 386; Gustavensen v. State, 10 Wyo. 300; State v. Whipple, 215 Pac. 14 prejudice will not be presumed from error; Linderberg v. Howe, 215, 230; the affidavits of the jurors show no prejudice; the evidence will be viewed in a light most favorable to sustain the verdict; Bank v. Bank, 215 Pac. 473; the second motion for a new trial is forbidden if not authorized by statute; 201 Pac. 164; defendant was entitled to but one motion; Doran v. Kennedy, 237 U. S. 362; Dorland v. Cunningham, 6 Pac. 135; Thompson on Trials, 2727; deci-

sion on first motion was res judicata; Rogers v. McCord, 91 Pac. 865; no error is assigned in overruling the first motion; petition and error is void since it was based on the second motion, which was without authority, leaving nothing before the court for review; excessive damages is not ground for new trial, unless shown to be given under influence of passion or prejudice; Kelley v. Co., 181 Pac. 331; 5870 C. S.; the assignment for excessive punitive damages is insufficient. There is no assignment as to excessive damages for acts of trespass which were wilful and malicious; Guffy v. Smith, 237 U. S. 119; Moseback v. Sheep Co., 210 Pac. 910; the acts of trespass had been forbidden; Cent. C. & C. Co. v. Peny, 173 Fed. 343; Henderson v. Coleman, (Wyo.) 115 Pac. 439; the Midwest Co. had notice; Thornton O. & G. 121; Seaman v. Canal Co., 213 Pac. 938; question as to sufficiency of evidence is addressed to the sound discretion of court; State v. Brantingham, 212 Pac. 501; and cannot be reviewed, unless directed verdict was requested; Allen v. Shepherd, 169 Pac. 1115; McVey v. Jemison, 207 Pac. 633; defendant's claim of good faith is unsupported; Guffy v. Smith, supra; Bolles v. Co., 106 U. S. 432; the evidence of malice is conclusive; Scott v. McDonald, 165 U. S. 58; Cochran v. Miller, 13 Iowa 128; prior judgment is res judicata, 23 Cyc. 1215; Vickers v. Vickers, 202 Pac. 31; Hawkins v. Ferguson, 193 Pac. 36; Mason v. Ruby, 204 Pac. 1071; Freeman on Judgments 249; facts decided in first suit cannot be disputed; Bigelow on Estoppel, 110-112; Floershien v. Board of Co. Com., 212 Pac. 453; Waters v. Bank, 150 Pac. 1126; Smith v. Peters, 188 Pac. 811; Davis v. Ramsdell, 181 Pac. 96; Holleman v. Cushing, 202 Pac. 1031; corporation acquiring subject matter pending suit is bound by decree, 163 Fed. 914; Smith v. Clark, 106 Pac. 659; principal of estoppel extends to all points litigated; Smith v. Clark, supra; Benson v. Harriman, 205 Pac. 257; Bigelow on Estoppel, p. 8; Curtis v. Lennes, 208 Pac. 81; Goodeagle v. Moore, 214 Pac. 725; punitive damages are imposed on the theory of punish-

ment; Jones Co. v. Woody, 169 Pac. 879; Rhyne v. Turley, 37 Okla. 150, 131 Pac. 695; the financial standing of defendant may be considered; White v. White, 76 Kan. 82, 90 Pac. 1087; exemplary damages cannot be excessive, unless it be shown that the jury acted from passion or prejudice; Mallory v. Bennet, 15 Fed. 365; Smith v. Pittsburgh, 90 Fed. 783; Cornelius v. Smith, 175 Pac. 754; Jensen v. Co., 138 Pac. 1192; Torea Co. v. Yutich, 206 Pac. 595; Webb v. Co., 180 N. W. 263; Hunt v. Van, 202 Pac. 574; Cronberg v. Johnson, 208 Pac. 448; error does not presume injury; State v. Wells, 202 Pac. 7; presumption is that the jury understood instructions; Schwertz v. Co., 205 Pac. 217; a juror's statement cannot be heard to impeach his verdict; State v. Cook, 194 Pac. 404; Okla. & Co. v. McGhee, 202 Pac. 277; the cross appeal challenges the right of defendants to move improvements which were placed on the premises; Hurd v. Ry., 176 Mo. 115; Martin v. Bartmus, 207 Pac. 550; H. & L. S. & R. Co. v. Pac. Ry., 205 Pac. 229; having been placed there by trespassers, plaintiffs are entitled to recover their value thereof; Cosgriff v. Miller, 10 Wyo. 190; dismissal of defendant's appeal does not preclude consideration of plaintiffs cross appeal; Crane v. Oregon Short Line, 133 Pac. 811.

*John D. Clark and Hagens & Murane* in reply.

Section 5870 C. S. does not restrict the number of motions that may be filed after verdict; 5895 permits certain motions; Grover v. Lovella, 131 Pac. 43; Sections 5896-5897, also authorize certain motions. The court reserves control of its judgment during the term; juries may be sent back to correct their judgments; Abbott's Jury Trials 850; Smith v. Bank, 63 N. W. 796; Co. v. Skoman, 29 Pac. 21; a motion will not be called one for a new trial unless it be such in fact; U. P. R. R. Co. v. Bryne, 2 Wyo. 109; Boburg v. Prahl, 3 Wyo. 325; Mitter v. Coal Co., 27 Wyo. 72, 28 Wyo. 439; Stanton v. Co., 25 Wyo. 138; motion for directed verdict or judgment notwithstanding the verdict, differs

from a motion for new trial; Slokum v. Ins. Co., 58 L. ed. 879, 13 L. R. A. (N. S.) 790; motion in arrest cannot take the place of motion for new trial; Thompson on Trials, 1974; Eugemoen v. C. & St. P. R. Co., 210 Fed. 896; Wagner v. Co., 126 Pac. 434; Davis v. Co., 134 Pac. 180; motion to vacate judgment is not motion for new trial; McCartner v. Shepherd, 117 Pac. 814; Cont. Gin Co. v. Arnold, 167 Pac. 614; after motion to vacate verdict is overruled, a motion for new trial is the proper practice; Campbell v. Weller, (Wyo.) 164 Pac. 881; counsel for defendants in error failed to answer the authorities submitted; there was no evidence justifying the submission of the question of damages to the jury; there was no evidence of gun threats. The doctrine of punitive damages has been so much abused that it has been repudiated in a number of states; Winkler v. Roeder, (Nebr.) 37 N. W. 607; Bank of Commerce v. Goos, (Nebr.) 58 N. W. 84; most of the authorities cited on the subject of punitive damages by defendant in error are not in point. The cross appeal seeks to reach movable chattels, which do not come within rule contended for; Van Ness v. Pacard, 7 L. ed. 374; Scudder v. Anderson, (Mich.) 19 N. W. 775; Carpenter v. Walker, (Mass.) 5 N. E. 160; Young v. Chandler, 66 Atl. 539; Perry v. Oil Co. (Ind.) 88 N. E. 859; Atchison Topeka Ry. Co. v. Morgan, 21 Pac. 809; Couch v. Welch, 66 Pac. 600; Updegraff v. Lesen, 62 Pac. 342; the machinery and fixtures here involved were not attached to the estate, and no claim could be urged by plaintiff with respect to them; Son v. Adamson, 204 Pac. 392; Midland Co. v. Rudneck, 204 Pac. 1075. .

POTTER, Chief Justice.

This is a proceeding in error for the review of a judgment rendered upon the verdict of a jury for the plaintiffs in an action of trespass, including punitive as well as compensatory damages. A question of practice is presented upon a contention of defendants in error that the matters discussed in the brief for plaintiffs in error are not properly before the court for consideration. That is based chiefly

upon the procedure below following the verdict. The verdict was received on December 1, 1920. On the next day the defendants filed a motion "to set aside the verdict" upon the following stated grounds:

1. That the evidence is insufficient to warrant a verdict for punitive or exemplary damages against either of the defendants. 2. That the verdict for punitive or exemplary damages is excessive and not justified upon any theory of the case. 3. That the verdict for compensatory damages is not supported by the evidence and is excessive. 4. That the verdict was received in the absence of the defendants and their attorneys and the jury discharged without an opportunity on the part of the defendants to have the jury polled.

It concluded by moving that the case be reserved for future argument and consideration and that in the meantime the entry of the judgment be withheld. On the same day the court directed that judgment be not entered until further order. That motion was overruled on December 11, the order describing it as a motion "to set aside the verdict and for judgment notwithstanding the verdict;" and on the same day judgment was rendered upon and in conformity to the verdict. On that day also the defendants filed separate motions for a new trial, each being the same in substance and effect; and they were each overruled on December 31. Each contained the following grounds, among others:

I. Excessive damages appearing to have been given under the influence of passion and prejudice.

II. Error in the assessment of the amount of recovery, said amount being too large, and said action being for the injury to or trespassing upon property.

III. That the verdict and decision is not sustained by sufficient evidence, and is contrary to law.

IV. Errors in refusing certain requested instructions and in giving others, admitting and excluding evidence, and refusing to direct a verdict for defendants.

Each defendant against whom judgment was rendered filed a separate petition in error, assigning as error (1) the overruling of the motion for a new trial, filed on December 11 and overruled on December 31, and (2) the overruling of the motion to set aside the verdict, filed on December 2 and overruled on December 11. There must be considered also, in connection with these facts, the principle established by our uniform decisions and expressed in one of our rules, that nothing which could have been properly assigned as a ground for a new trial in the court below will be considered in a proceeding in error, unless it shall appear that the same was properly presented to the court below by a motion for a new trial, that such motion was overruled, and that an exception was at the time reserved to such ruling, all of which shall be embraced in a bill of exceptions. And the written rule provides further that the ruling of the court below upon each matter properly presented by a motion for a new trial shall be sufficiently questioned in a proceeding in error in this court by an assignment that the court below erred in overruling said motion.

The grounds of the contention that no question has been properly saved for consideration here relate to the two motions aforesaid. Stated generally they are that the first motion should be considered as a motion for a new trial, though not so entitled; that it was insufficient in form and substance as such a motion; that the motion filed on December 11 was properly overruled without regard to the merit of any ground therein stated for the reason that, although filed within the time allowed by statute for the filing of a motion for a new trial, the filing of a second motion for that purpose is not permissible except upon leave of court; and, finally, that no motion by defendants at the close of the evidence for a directed verdict in their favor having been made, their exception to the overruling of a motion for a new trial cannot present here the question of the sufficiency of the evidence to sustain the verdict.

1.   The first two points are based primarily upon a rule established by judicial decisions limiting or conditioning the renewal of motions, or the filing of successive motions, for the same or substantially the same relief.   But the rule is not as arbitrary or inelastic as counsel relying upon it seems to suppose.   It is a rule of practice only, to be reasonably applied, not for the purpose of defeating but to aid in the administration of justice.   This question of the renewal of motions, or the filing of a second motion or successive motions for the same relief is now presented to this court for the first time, and we are, therefore, free to consider it unincumbered by precedent in our own decisions. The rule seems in the main to be fairly well settled, though there may be some conflict respecting the conditions for its application.

We do not understand that there is any inherent objection to the renewal of a motion.   As defined by statute, a motion is an application for an order addressed to a court or judge, by a party to a suit or proceeding, or one interested therein.   Comp. Stat. 1920, Sec. 5714.   And that conforms substantially to the usual definition.   28 Cyc. 3, 4; 19 R. C. L. 671; 14 Ency. Pl. & Pr. 73.   It is, generally, confined to incidental matters in the progress of a cause (28 Cyc. 4), and is appropriate only in the absence of remedies by regular pleadings, and "cannot," as a rule, "be made available to dispose of the merits of the case."   19 R. C. L. 671.   Hence the strict rule of *res adjudicata* does not apply, and a trial court is not without jurisdiction to, but may, in its discretion, allow such a motion to be renewed.   Id. 19 R. C. L. 676; 14 Ency. Pl. & Pr. 176.   But for convenience in the conduct of judicial business, and, generally, to guard against abuse of the privilege granted to litigants by law, a rule has been adopted circumscribing the right to ask for relief once denied by the renewal of a motion therefor.   That rule, as applicable to motions generally, we find well stated, with the reasons therefor, and the exceptions thereto, in 14

Ency. Pl. & Pr. at pages 176 to 186 inclusive, part of which we quote:

"The doctrine of *res judicata* does not strictly apply to decisions upon interlocutory motions, * * * although there is a growing disposition to enlarge the scope of the doctrine, and to regard the decision of a motion as *res judicata* where the proceedings permit of a full hearing upon the merits, and especially where the order may be reviewed upon appeal. But although * * * not technically *res judicata* the order should not be disregarded when the same question is raised again in the same action. And while a motion once denied may ordinarly be renewed and a former denial will be no absolute bar to granting relief upon the second application, this cannot usually be done without first obtaining leave of court * * *. The rule requiring leave to be obtained * * * is one of practice merely, to avoid confusion and abuses, and it does not affect the power of the court to reconsider its decision upon additional facts presented on a subsequent motion without such consent having been preliminarily obtained. A motion for entirely distinct relief, though based upon the same grounds as a previous motion, is not a renewal of such motion, and hence not within the rule requiring leave of court. But if the motions are substantially the same, though in different form, the rule applies * * *. Motions for the same relief upon different grounds have sometimes been allowed to be renewed. But this will not be done where it would result in permitting a party to bring forward his objections by instalments, without any excuse for not presenting all his objections upon the former motion."

It is said also in the same work (p. 187) that whether or not leave will be granted to renew upon the same or additional papers is a matter resting within the discretion of the court, and unless the contrary appears, this discretion will be presumed to have been properly exercised, and will not be interfered with or reviewed upon appeal or other-

wise, except in case of palpable abuse; and (p. 191) that since the court has power to disregard the rule requiring leave it would seem that hearing the second motion and granting the relief implies permission to renew the motion.

The rule is stated substantially to the same effect in 19 R. C. L. 676-7. And see, 28 Cyc. 18-20; 20 Stand. Ency. Pro. 630. It is said in Ruling Case Law that the fact that the court hears a second motion is conclusive proof that the court either before or at the hearing had given leave to present the matter anew, citing: Clopton v. Clopton, 10 N. D. 569, 88 N. W. 562, 88 A. S. R. 749; Fisk v. Hicks, 29 S. D. 399, 137 N. W. 424, Ann. Cas. 1914 D. 971.

A motion for a new trial differs in at least two important particulars from the ordinary motion for incidental relief. The time within which it may be made or filed and what shall constitute a cause are usually prescribed and limited by statute; and in this state, as in some other jurisdictions, the motion may be necessary as a condition precedent to appellate review, and, as conceded, it was necessary in this case. But unless and except as qualified by these or similar considerations, the general rules aforesaid relating to the renewal of motions ought, no doubt, to apply. In the volume of Ency. Pl. & Pr. above cited (page 947) it is said that after a motion for a new trial has been "absolutely" denied a second motion upon substantially the same grounds will not be considered "as the matters embraced in the former motion have become *res adjudicata.*" It is there further said, however, that in some states it is held that during the same term the court may vacate the order, and, on rehearing, may grant a new trial; and that if new grounds are discovered after the motion is decided they may be incorporated in the motion by amendment before the time for filing the motion has expired, or if this cannot be done, a separate and second motion is proper. Also, page 948, that to prevent a failure of justice a court may vacate its order granting or refusing a new trial and change such order, if the power be exercised during term or within the time fixed

for hearing such motions. And, page 894, that the motion may be amended by making the charges of error more specific; and, page 895, that if all the errors have not been assigned, a second motion may be filed, including all the assignments relied upon, and "without leave of court if the time has not expired." See also 29 Cyc. 728-9.

It is quite generally held that after the time allowed by statute for filing the motion has expired, no right exists to file another upon new grounds, or to amend a motion filed within the time by stating additional grounds, and that the filing of such a paper may be refused, or if filed without permission may be disregarded or ordered stricken from the files, unless under a statute permitting it the party can show that he was unavoidably prevented from filing his motion within the time regularly allowed. Culp v. Steere, 47 Kan. 746, 28 Pac. 897; State v. McDaniel, 39 Or. 161, 65 Pac. 520; Aultman v. Leahey, 24 Neb. 286; 38 N. W. 740; Gullion v. Traver, 64 Neb. 51, 89 N. W. 404; Perry v. Eaves, 4 Kan. App. 26, 45 Pac. 718; Morrison v. Hazen, 10 O. N. Pr. (N. S.) 353; Bank v. Porter, 148 Mo. 176; 49 S. W. 982; Hesse v. Seyp, 88 Mo. App. 66. But in at least one state an amendment may be allowed after the time has expired, if germane and proper to the object and purpose of the original motion and cannot be regarded in any legitimate sense as a new motion. Snowden v. Craig, 20 Ia. 477; Dutton v. Seevers, 89 Ia. 302. A rule substantially to the same effect has been adopted in another state, viz: That a motion for a new trial may be amended after the three days allowed by statute for filing the same by a clearer or more appropriate statement or elaboration of the grounds contained therein; but such an amendment, filed after the statutory time has passed, cannot set up new and independent grounds. Rice v. Folsom, 32 Okl. 496, 122 Pac. 236; Rogers v. Quabner, 41 Okl. 107, 137 Pac. 361; Wiggins v. Jackson, (Okl.) 153 Pac. 879; Potts v. Rubesam, 54 Okl. 408, 156 Pac. 357. And the language of the Oklahoma Code upon the subject is the same as ours, except that the limita-

tion period there is three days instead of ten days now allowed by our statute.

In Kentucky, under like statutory provisions, the announced rule is that where the motion made upon stated grounds has been filed within the required period, additional grounds may be permitted to be filed after the expiration of that period and before the motion is disposed of, but not after the motion has been overruled. Woolridge v. White, 105 Ky. 247; 48 S. W. 1081; Kentucky Cent. Ry. Co. v. Smith, 93 Ky. 449; 20 S. W. 392, 18 L. R. A. 63; Houston v. Kidwell, 83 Ky. 301. The reason for denying the right after the motion has been overruled is stated in Ry. Co. v. Smith as follows:

"The object of requiring a motion within the three days is to enable the court to render a judgment without delay, and when the facts and questions of law are fresh in the minds of court and counsel; and it is the evident meaning and purpose of the Code to close the door to any other motion for a new trial upon any other grounds than the exceptions made unless unavoidably prevented. Such, too, is the safe construction of this provision of the Code. For if motions are permitted to be renewed from day to day during the term, the time of the court would be consumed in hearing motions for new trials, for amendments would likely be allowed whenever the minds of counsel suggested some additional reasons for another hearing."

And that is usually the ground stated for denying a right to renew after a first motion has been overruled, or to amend after the limitation period has expired.

In none of the cases above cited denying the right to amend or renew a motion after the expiration of the prescribed period is there an express denial of such right *before* such time has expired; and there would seem to be no substantial objection to that, unless forbidden expressly by statute, except upon the theory that it would burden the

court with frequent hearings upon the same matter, if the doctrine be accepted that the principles of res judicata do not apply.

In City of Lincoln v. Beckman, 23 Neb. 677, 37 N. W. 593, decided upon code provisions like our own, it appeared that two motions for a new trial were filed within the statutory period; the second motion being entitled a ''supplemental motion.'' Upon the contention in the appellate court that the latter motion was filed without leave, the court said:

''The fact that the motion was styled 'supplemental' will have no bearing in the case, nor was it necessary that leave should be had in order to file it. It is somewhat difficult to understand the purpose of the pleader at the time of the filing of this motion. He does not seem to have desired to file it as an amended motion for a new trial, as he omits any reference to the grounds alleged in his original motion. It cannot be styled a 'supplemental' motion, for the reason that all of the causes alleged therein existed at the time of filing the original motion. It is quite probable that he intended to abandon the grounds alleged in the first motion, and stand upon the second. While he had a clear right to file a motion for a new trial at any time within the 22d, 23d or 24th days of May, yet we know of no rule of law which would authorize the filing of a motion for a new trial in separate sections or parts, thereby unnecessarily encumbering the record. We will therefore give our attention solely to the *last* motion filed.''

In Indiana the view was taken that the *first* and *not* the *second* motion should be considered, the courts saying that all the grounds should be included in one motion, and that ''there might be a case where a second motion for a new trial would be proper, but this is not such a one.'' Moon v. Jennings, 119 Ind. 130; 20 N. E. 748, 12 Am. St. Rep. 383. In Kincaid v. Walla Walla Tr. Co., 57 Wash. 334, 106 Pac. 918, 135 Am. St. Rep. 980, the court say that when

a motion filed in due time has been denied, the judgment becomes final as against further like motions. Whether that principle should apply when the motion has been denied on the ground of its insufficiency as to form without considering the merits may be doubtful. See Fisk v. Hicks, 29 S. D. 399, 137 N. W. 424.

In Ohio it was held in a cause on error before one of the circuit courts (Ind. Coal Co. v. Quirk, 16 O. C. C. N. S. 546), affirmed by the Supreme Court without opinion (80 O. St. 746, 89 N. E. 1120), that a second motion for a new trial may be filed within the three days allowed for filing such motions, when based upon a different ground and one not known at the time of filing the first motion, and that it is immaterial that the second motion is designated as ''an amendment'' of the first. It had been alleged in the amended motion and was found by the court that the new ground stated was unknown to the mover when the original motion was filed; hence the court's opinion was expressed with reference to that fact alone. It was also held in that case that the fact that the court entertained the motion by hearing and disposing of it conclusively implied permission to file it. In a previous circuit court decision of the same state it was held that under the broad power of amendment given by statute it is competent *after* the expiration of the three days to amend the original motion for new trial filed within the proper time, so that it may *allege as additional grounds new matter complained of as error*. Seagrave v. Hall, 10 O. C. C. 395.

But the right of the court to act upon an amended motion filed within the limitation period, but after the overruling of the original motion, has been expressly upheld against a contention that the court had exhausted its power. Thompson v. Thompson, 109 Mo. App. 462; 84 S. W. 1022. The court in that case said that some grounds of the amended motion were not stated in the first one and therefore could not have been adjudicated by the overruling thereof; and, concluding, said further:

"Cases exist in which it was held that a new trial could not be granted on an amended or supplemental motion, but in most instances, if not all, the second motion was filed after the lapse of the statutory period. Sometimes the new motion was identical with the first one as to grounds. Attending to the exact situation of this case, we find direct precedents holding that as there were fresh reasons presented in the second motion, and as it was filed within four days after the judgment, the court was not concluded by its previous ruling. (Puckett v. Reed, 37 Tex. 308; Bryorly v. Clark, 48 Tex. 345; White v. Perkins, 16 Ind. 358; Hughes v. McGee, 1 A. K. Marsh (Ky.) 21.)"

The records of our own court show a case decided in 1889, after our present code was adopted, wherein a second motion for a new trial was filed, and after the first was overruled, which seems to have been heard and disposed of on the merits, without objection that it was not entitled to be so considered; McBride v. U. P. Ry. Co., 3 Wyo. 247, 21 Pac. 687. There was a special verdict in the case, returned July 1, 1886, including an assessment of the plaintiff's damages at $25,000, if he should be held entitled to recover upon the facts found. The opinion states that on July 2, the plaintiff moved for judgment in his favor upon the verdict, and on July 17 filed a motion to vacate the verdict and for a new trial; that on July 19, both motions were overruled; and that on the same day, the plaintiff "again moved a new trial, assigning, among other grounds, that the court erred in rendering judgment for the defendant upon the verdict." The court then stated the questions for decision to be whether the court erred in refusing to grant a new trial upon the motion of plaintiff, and whether it erred in refusing to render judgment in favor of plaintiff, and in rendering judgment for the defendant upon the special verdict.

The situation here, treating each motion as one for a new trial, would be the same as that described in the case last

cited from Missouri, assuming the second motion to have been filed after the court had overruled the first motion; that order having been made and the second motion filed on the same day. This is not, therefore, a case where it is attempted to *amend* an original or *file a new* motion *after* the expiration of the limitation period, but the question is confined to the filing of a new motion *before* the expiration of such period.

Counsel for plaintiffs in error insist, however, that the first of the two motions is not, and was not intended as, a motion for a new trial, nor understood or considered as such in the trial court; a contention which, if sustained, would be sufficient to dispose of the question of the propriety of considering in this court the second motion. But we have felt it proper to state the principles, with a review of the authorities, relating to the amendment or renewal of motions generally and as applicable to a motion for a new trial. We need not be controlled by such a principle of practice established in other jurisdictions, unless appearing to be the more reasonable and consonant with other rules of our procedure either judicially established or prescribed by statute, for, as said by Judge Ranney in Ellis v. Ins. Co., 4 O. St. 628, 64 Am. Dec. 610, we may say here: "If there is anything exclusively our own, it is our legal procedure." Yet the authoriites declaring it are entitled at least to respectful consideration and may be sufficiently persuasive to require acceptance; and we are not inclined to question the soundness or propriety of the general principles so established, subject to such exceptions as might be necessary under the peculiar practice of our own jurisdiction.

With respect to a statutory motion for a new trial, authorized within a limited period upon certain specified grounds, any general rule opposed to or limiting the right to amend or renew should be considered here in connection with our rule conditioning the right of appellate review upon the making and hearing of such a motion with an excep-

tion to an order overruling it, as to any question proper to be presented thereby in the trial court; and that requires a more liberal interpretation or application of any such general rule than where appellate practice is not so controlled.   Otherwise, our appellate rule aforesaid might become oppressive through a narrow interpretation with more restrictive consequences than was intended or as heretofore understood.   We think, indeed, it may reasonably be doubted whether our statute can reasonably be construed as forbidding more than one or authorizing only one application for a new trial within the stated period.   That might perhaps result from a *strict* interpretation of the statutory provisions, but the Code expressly provides that it "shall be liberally construed in order to promote its objects and assist the parties in obtaining justice."   And, in view of our appellate rule aforesaid, it seems more consistent with the requirements for a liberal construction to permit the filing of a new or second motion, within the limitation period of ten days, without first obtaining leave of court, whether intended to state additional grounds or to correct or elaborate the statement of the grounds embraced in the original motion, to the end that the alleged errors occurring upon the trial or as the result of the verdict or decision may be presented to the trial court, than to require by judicial decision alone that the unsuccessful party, with respect to his right to be heard in the appellate court, must stand or fall upon the sufficiency as to form or substance of a single motion, perhaps hurriedly prepared, without right to either amend or renew *within* the statutory period unless upon leave first granted.

The practice in that respect should, of course, be subject to reasonable limitations to avoid abuse; and the trial court must be allowed a sufficient discretion in the matter to so regulate and control the practice as to guard against or prevent abuse.   There should be some reasonable excuse or justification for a new motion, and it should not be understood that a party may at pleasure or through mere caprice make

his application through the medium of separate or several motions, with no other possible result than to burden the court with repeated hearings upon the same matter. It is clear that, without violating any general principle, the court may, within the limitation period, grant leave to file a new motion; but we do not feel prepared to hold that such leave must first be obtained in all cases, since the court will be left with power, in the exercise of the discretion above indicated, to strike or refuse to consider a new motion seeming to have been capriciously or unreasonably filed, especially when a new motion presents no additional question.

Treating, then, the first motion aforesaid in this case strictly as a motion for a new trial, we see nothing in the record to indicate a disposition on the part of counsel to annoy the court by frequent applications or hearings of the same matter, nor any legal reason why the second motion might not properly have been filed when it was and heard and considered by the court upon its merits. And we think the record is to be understood as showing that said motion was heard and considered upon its merits without objection of counsel or suggestion by the court that it was not entitled to be so considered. Although filed after judgment was rendered upon the verdict, that, under our practice, is not improper. Mitter v. Black Diamond Coal Co., 27 Wyo. 72, 81, 193 Pac. 529; Young v. Shallenberger, 53 O. St. 291, 41 N. E. 518; Weaver v. Columbus etc. Ry. Co., 55 O. St. 491, 45 N. E. 717.

We are not disposed, however, to rest our decision upon that proposition alone. For we are not convinced that the first motion, in its relation to the second, must be considered as a statutory motion for a new trial. The argument for defendants in error in that respect is that a vacation of the verdict asked for by the motion would necessarily result in a new trial, and that it was, therefore, in effect a motion for a new trial; and cases are cited holding a motion to be one for a new trial, though not so entitled or not expressly asking therefor. The object of most of such decisions, if not

all, was to protect the moving party's rights by *saving* the motion. And we are not unfamiliar with the principle of liberal construction usually applied for that purpose. In this case, as in the cases cited, we think the motion is to be classified not alone by its title or what appears upon its face, but it is important also to consider, so far as can be ascertained from the record, what its real purpose was and how it was understood and treated by the parties and the trial court. We think the record discloses that it was not intended or understood to be the ordinary statutory motion for a new trial. The fact, as here conceded, that not a single ground specified in the statute for such a motion was well stated therein, is significant, as well also that it questioned only the right upon the evidence to recover either punitive or compensatory damages, and the propriety of receiving the verdict in the absence of the attorneys for defendants. The statute authorizes a new trial for excessive damages "appearing to have been given under the influence of passion or prejudice." But this motion did not allege passion or prejudice. A new trial is authorized also where the verdict is not sustained by sufficient evidence, or is contrary to law. But the motion did not assail the entire verdict except as to the manner of receiving it. So that if it was nothing but a motion for a new trial it might have been overruled on the sole ground of its insufficiency in form and substance.

It is contended for the plaintiffs in error that the purpose of the motion was to obtain an order reserving the case for future argument, and thereupon a reconsideration of the court's refusal to instruct the jury that exemplary damages were not recoverable in the case, and its action in giving, over objection, an instruction authorizing, in addition to actual damages, such further amount by way of punitive damages as the jury might deem proper under the instructions, assuming that the court might, upon sustaining the exceptions to such action, recall the jury for further instructions, or direct such judgment to be entered as might

have been directed upon the trial, under Section 5896, Comp. Stat. 1920, providing for directing a verdict subject to the opinion of the court, and thereafter a judgment with like effect as if directed for the party at the trial. But that section would not apply, for a verdict subject to the court's opinion was not directed. Said counsel argue, however, that even if what was then supposed might be done would be impossible, that should not necessarily render said motion one for a new trial,—whether its nature is to be determined from the title or the substance thereof. The record shows that on the same day that this motion was presented, an order was entered reciting that counsel for defendants had suggested a desire to present a motion before the entry of judgment, and directing that judgment be not entered upon the verdict until the further order of the court. And the order disposing of this first motion describes it as a motion "to set aside the verdict and for judgment notwithstanding the verdict."

Counsel for defendants in error calls our attention to the original of that order sent up with the record and to an interlineation therein showing, as he says, that as originally prepared by him it described the motion as one merely for "judgment notwithstanding the verdict," but that afterwards, immediately preceding those quoted words, he interlined the words "to set aside the verdict," intending them as a substitute for the words "for judgment notwithstanding the verdict," omitting inadvertently to erase the latter. But counsel's reference to such original order and the interlineation does not sustain his point. The words "to set aside the verdict" are not the whole of the interlineation; they are followed by the word "and" leaving the order with the interlineation to read in describing the motion "to set aside the verdict *and* for judgment notwithstanding the verdict."

It seems to be now conceded that the motion was not in fact a motion for judgment notwithstanding the verdict. But while it may not, technically, be entitled to be classified

as such a motion, it seems to have been understood by counsel and the court to be something other than the ordinary statutory motion for a new trial. The fact is that the motion would seem to have no clear standing under our practice, and might have been overruled on that ground alone. That is not, however, sufficient to justify a decision declaring it to be a motion for a new trial, any more than for declaring it to be one for judgment notwithstanding the verdict, though insufficient, or for judgment under section 5896. And a motion for judgment notwithstanding the verdict, at least, does not prevent the making of a subsequent motion for a new trial. McBride v. U. P. Ry. Co., 3 Wyo. 247, 21 Pac. 687; Davis v. Turner, 69 O. St. 101, 68 N. E. 819.

2. The final objection to the procedure, that the question of the sufficiency of the evidence to sustain the verdict is not properly presented, since there was no motion by the defendants at the close of the evidence upon the trial for a directed verdict in their favor, affects the case as submitted here only so far as it may be necessary to determine whether the evidence was sufficient to justify a verdict for any, even a nominal amount, in favor of the plaintiff. The principal question discussed in the brief of plaintiffs in error is not, as counsel for defendants in error has assumed, the sufficiency of the evidence to sustain the verdict in its entirety, but the right of the plaintiff below, upon the evidence and the law, to recover punitive or exemplary damages. And that is discussed under other grounds than the insufficiency of the evidence, viz: excessive damages given under the influence of passion and prejudice; error in the assessment of the amount of recovery; error in refusing a requested instruction denying the right to recover punitive or exemplary damages; and error in giving instructions authorizing a verdict for such damages. See Syndicate Imp. Co. v. Bradley, 7 Wyo. 228, 51 Pac. 242, 52 Pac. 532; Turner v. Horton, 18 Wyo. 281, 106 Pac. 288.

But so far as the point challenging the propriety of considering the sufficiency of evidence generally upon an exception alone to the overruling of a motion for a new trial on that ground may be material here, it is contrary to the well settled practice in this jurisdiction, and, in our opinion, opposed to the letter and spirit of our statutory provisions for a new trial (C. S. 1920, §§ 5870-5873), as well as our rule aforesaid requiring a motion for a new trial and an exception to the order overruling it as a condition to the consideration on error of any question which might properly have been presented to the trial court by such a motion.

There have been many cases decided in this court wherein the question of the sufficiency of the evidence to sustain the verdict, findings or judgment has been considered without inquiry as to whether there had been a motion for a directed verdict in the case of a jury trial, or for judgment in the case of a trial without a jury, or whether there had been an exception at the trial to a ruling upon any such motion; indeed, we are satisfied that no such motion had been made or exception taken in most if in any of said cases. And that practice is justified, we think, by relevant statutory provisions and our appellate rule aforesaid conditioning the right to be heard in this court. It has been held to be the proper practice in at least one case to which we shall refer, and inferentially in others. So that notwithstanding the rule on the subject in any other state, the practice here has become so well established that it should not now be overthrown except for the most cogent reasons.

This question, like the one of practice above discussed, cannot properly be considered without reference to the rule of this court which, in substantially the form in which it now appears has been continuously in force for more than fifty years, that assigning error in the overruling of the motion for a new trial shall be sufficient to question in this court each matter presented by the motion. The practical effect upon that rule which might result from accepting here the practice at common law and in some other jurisdic-

tions in this country concerning the right to and the procedure for a new trial, was long ago well stated by Judge Lacey, then Chief Justice, in the case of U. S. v. Trabing, 3 Wyo. 144, 6 Pac. 721, concluding a reference to several of the diverse rulings upon the subject. Speaking for the court, he said:

"Much of this diversity grows out of differences in the statutes of the several states, but it at least seems to emphasize the conclusion that nothing is involved except a mere question of practice. If this court should hold that a motion for a new trial waives exceptions to rulings on the trial, and that such motion is in all things addressed to the discretion of the trial court, *then the rule* (italics ours) *requiring such motion to be made would be a delusion, and should not be enforced. It would be taking away substantial rights, and giving instead a shadow.*"

It was further said in that connection that the effect of our rule, considered with the statute providing for new trials, is to make the method declared by the rule the only one by which errors of law occurring on the trial may be brought before this court for review, so that even as to such errors excepted to on the trial the assignment in this court must rest upon the denial of the motion for a new trial. And that the matter of granting a new trial for insufficiency of the evidence is not committed to the mere discretion of the trial court when disposing of a motion based upon that ground has been recognized since the earliest decisions of this court, and is made clear, we think, by the provisions of our statute; though whether the ruling of the trial court upon the matter will or will not be disturbed upon review here is dependent upon principles well settled by our decisions. See Hilliard Flume Co. v. Woods, 1 Wyo. 400; Garbanati v. Hinton, 2 Wyo. 271; Ketchum v. Davis, 3 Wyo. 164, 13 Pac. 15; Edwards v. Murray, 5 Wyo. 153, 38 Pac. 681; Wyo. Cent. Irr. Co. v. Burroughs, 19 Wyo. 176, 115

Pac. 434. The statute (C. S. 1920, § 5870), defining a new trial as a re-examination in the same court of an issue of fact, after a verdict by a jury, a report of a referee or master, or a decision by the court, then declares that the verdict, report or decision "shall be vacated, and a new trial granted," on the application of the party aggrieved, "for any of the following causes affecting materially the substantial rights of such party." This is followed by the statement of eight consecutively numbered causes or grounds, including, as the sixth, "that the verdict, report or decision is not sustained by sufficient evidence or is contrary to law." This would seem to impose a duty upon the court, and it was so interpreted in the early case of Granger v. Lewis, 2 Wyo. 231, wherein Justice Peck, delivering the principle opinion in the case, said:

"The first ground of the motion, is that the verdict was rendered without sufficient evidence, and against the law. To have been rendered without sufficient evidence, there must either have been a conflict, and the verdict against the weight of evidence, and by a rule precise, clear and technical, it was then the duty of the lower court to relieve her of the verdict; or the case must have gone to the jury on evidence insufficient to establish a *prima facie* case for the plaintiff, and then it was the duty of that court to vacate the verdict, though the defendant had omitted to claim, before the jury was sent out, a non-suit, and that was its duty, because, notwithstanding this neglect of the defendant, the verdict had no basis.  *  *  *;  so that this first ground alleged in the motion suffices to secure for the party a thorough examination of the previous case without further complaint."

That learned judge had also, in that opinion, said that the objection that the verdict was not sustained by sufficient evidence might be raised by the motion (for a new trial) "without prior exception."

In Kester v. Wagner, 22 Wyo. 512, 145 Pac. 748, this court again said that the statute declaring that a verdict shall be set aside and a new trial granted when the verdict is not sustained by sufficient evidence "imposes on the trial court the duty of determining * * * whether or not substantial justice warrants the verdict."

It may be conceded that the rule contended for by defendants in error prevails in a few of the other states, but usually under statutory provisions or settled procedure unlike our own. We are unwilling to follow the Oklahoma cases decided upon similar code provisions. They are out of harmony with our practice in other rsepects. Our statute regulating the procedure for obtaining a new trial imposes, as we have held, a duty to grant a new trial, when it appears that the evidence is insufficient or contrary to law and a motion is timely made upon that ground, *without conditioning the right thereto* upon a showing of an exception upon the trial to a request for a directed verdict; and we would not now feel justified in restricting the right so granted by adopting the suggested rule. In our view the same question is not presented by a request for a directed verdict upon the trial, and an application for a motion for a new trial thereafter upon the ground that the evidence is insufficient. But we think there may be a substantial difference between them, with respect at least to the question of practice now under discussion. See Boswell v. Bank, 16 Wyo. 161, 92 Pac. 624, 93 Pac. 661; McDonald v. Met. St. Ry. Co., 167 N. Y. 66, 60 N. E. 282. It was said in the last cited case:

"The result of setting aside the verdict, and the result of directing one are widely different and should not be controlled upon the same conditions or circumstances. In the one case, there is a retrial. In the other, the judgment is final. One rests in discretion; the other upon legal right; one involves a mere matter of remedy and procedure; the other determines substantive and substantial rights. * * *

We think it cannot be correctly said in any case where the right of trial by jury exists and the evidence presents an actual issue of fact, that the court may properly direct a verdict.  So long as a question of fact exists, it is for the jury, and not for the court.  *  *  *  The credibility of witnesses, the effect and weight of conflicting and contradictory testimony, are all questions of fact and not questions of law.  If a court of review is dissatisfied with a verdict because against the weight or preponderance of the evidence, it may be set aside, but a new trial must be granted so that the issue of fact may be ultimately determined by the tribunal to which those questions are confined.  If there is no evidence to sustain an opposite verdict, a trial court is justified in directing one  *  *  *  because  *  *  *  as a matter of law, the party was not entitled to recover.''

It is stated as a general rule (3 C. J. 839) that the proper mode of raising objection to the evidence as insufficient is either by demurrer thereto, by motion for a non-suit or dismissal, or by motion or request for direction of a verdict in favor of the objecting party, ''according to the practice in the particular jurisdiction,'' and that such demurrer, motion, or request is necessary to the consideration of the objection on appeal, except in some jurisdictions, where the objection is that there was no evidence to go to the jury, or that the evidence is insufficient as a matter of law.  But we doubt that it was intended thereby to state a rule conditioning the right to be heard upon the objection when presented by a motion for a new trial authorized by statute.  Indeed, several of the cases cited do not touch upon that point.  In Home Fire Ins. Co. v. Phelps, 51 Neb. 623, 71 N. W. 303, one case cited, the point decided was that an exception to the refusal to direct a verdict cannot be considered unless the question be subsequently raised in the court below by a motion for a new trial.  Another case is Whitaker v. Mut. L. Ins. Co., 77 O. St. 518, 83 N. E. 899, wherein the decision was that although a party may have been entitled to a

directed verdict in his favor, he is not, for that reason, entitled to a final judgment in his favor in a reviewing court unless it appears that he had requested a directed verdict upon the trial, but that his remedy for the insufficiency of the evidence in the absence of such a request would be a new trial. And, as we shall show by reference to other Ohio cases, the rule contended for here does not prevail in that state. The case of Landis Mach. Co. v. Konantz Saddlery Co., 17 N. Dak. 310, 116 N. W. 333 is also cited. It holds that, to consider the objection to the sufficiency of the evidence, there must have been *either* a request for the direction of a verdict upon the trial, *or* a motion for a new trial alleging the evidence to be insufficient. And see Henry v. Maher, 6 N. Dak. 413, 71 N. W. 127.

The practice of demurring to the evidence has never prevailed in this state, and a motion for non-suit or dismissal has long been held improper under our practice. See Sayles v. Wilson, 222 Pac. 1020. The recognized procedure is a motion or request for a directed verdict, if it be desired to test the legal sufficiency of the evidence upon the trial. A provision of our statute, not above referred to, read in connection with the provisions for a new trial upon specified grounds, completely, we think, answers the objection to a consideration here of the sufficiency of the evidence upon the exception alone to the ruling upon a motion for a new trial. The provision is found in Sec. 5867, Comp. Stat. 1920, which has been a part of the Code since 1886. Rev. Stat. 1887, Sec. 2649. It is found in the chapter of the code entitled "exceptions," and declares that when the "exception is to the opinion of the court on a motion  *  *  *  for a new trial  *  *  *  because the verdict, or if a jury was waived, the finding of the court, is against the law or the evidence , the party excepting must reduce his exception to writing and present it to the court," or to the judge in vacation within the time for allowance; that if true, it shall be the duty of the court or the judge to allow and sign it, whereupon it shall be filed with the pleadings as a part of

the record. The authority thus given to except to the opinion of the court upon the motion made on the ground of insufficiency of the evidence is not conditioned upon the making or preserving of any previous exception. And under said provision, originally taken, with the remainder of our Civil Code, from Ohio, the decisions in that state have uniformly held that such exception presents for review the sufficiency of the evidence if the same be challenged by the motion, without anything more than the presentation of the exception by a bill of exceptions.

During a period that said provision was not a part of the Ohio statutes, it had been held in House v. Elliott, 6 O. St. 497, that there was no right to except to a ruling denying a motion for a new trial on the ground that the verdict was against the evidence. But it having again become incorporated in their statutes, the court, in Ide v. Churchill, 14 O. St. 372, directly held that it secured the right to such exception in all cases under the code, whether the facts are found by a jury or the court. See also Moore v. Coates, 35 O. St. 177; Weaver v. Columbus, S. & H. V. Ry. Co., 55 O. St. 491. For the reasons stated, the contentions of counsel for defendants in error relating to the procedure, and the right to consider here the questions discussed in the brief of plaintiffs here, cannot be sustained.

.3. This brings us to the merits of the case. The land upon which the trespass was alleged and found to have been committed is an eighty-acre tract upon which the plaintiffs, husband and wife, resided, situated in Fremont County, and within or in the neighborhood of what was commonly known in that vicinity as the "Pilot Butte Oil Field." It is alleged to have been committed by and the acts complained of were the result of bringing upon the land and operating thereon a drilling rig with the necessary and usual equipment for drilling for oil or gas; and the defendants shown and found to have so entered upon the land were then claiming the right to do so under an alleged oil and gas lease.

The plaintiffs demanded, by their amended petition, One Hundred and Fifty Thousand Dollars as actual damages and a like additional amount as exemplary or punitive damages. The theory of that, as well as the original, petition was that in addition to alleged general and special damages to the surface and the right of plaintiffs to the possession thereof, the acts complained of had materially injured the mineral rights of the plaintiffs. But it appearing upon the trial that, prior to the alleged trespass, the plaintiffs had, by deed, disposed of their mineral rights in the land to others not parties to the suit, the court restricted the jury to the consideration of damages to the surface only, if they should find for the plaintiffs.

A verdict was returned for the plaintiffs as against three of the defendants, the plaintiffs in error here, for the sum of $1250, assessed as actual damages, and the following as punitive damages:  $23,928 against the Midwest Refining Company, $1088 against the Hall Oil Co., and one dollar against Pearl L. Eddy. By the court's direction the verdict as to the remaining defendant, the Glenrock Oil Company, was in its favor, and that is not complained of here. The questions presented by the discussion in the briefs relate chiefly to the allowance of punitive damages, and those are all that need be separately considered; for while a liability for actual damages is not conceded, and counsel for plaintiffs in error do not desire to be understood as waiving any ground of their motion for a new trial, no such ground aside from the matter of punitive damages is separately discussed in their brief, but it is stated therein that grounds unrelated to that matter would probably not have been insisted upon except for the intention to contest such damages. The contentions concerning them are based principally upon the evidence, respecting which it is argued, first, that the evidence presents no case for punitive damages or authorizing an instruction permitting a verdict therefor, and, second, that the amounts assessed are so unwarranted and ex-

cessive as to show the verdict in that respect to have been the result of passion or prejudice.

The right to recover exemplary or punitive damages, using those words in this opinion as having the same meaning, was challenged upon the trial. At the close of the testimony, the defendants requested an instruction that the plaintiffs are not entitled to recover and the jury is not entitled to assess what are commonly known as exemplary or punitive damages, and the refusal thereof was excepted to. The defendants also excepted to instructions given upon the subject,—one given by the court of its own motion, to which both parties excepted, and the other at request of plaintiffs. They are as follows, in the order as given (Nos. 4 and 5,) the one given at the request of plaintiffs being the 4th:

No. 4. ''The court instructs the jury that the plaintiffs in this case sue for and claim two kinds of damages, viz: actual and punitive. The court instructs the jury that the actual damages claimed are based on the presumption that plaintiffs have been injured by the alleged acts of defendants, and that such actual damages as are necessary to actually compensate plaintiffs for the said injury so sustained. The court further instructs the jury that punitive damages are claimed herein by reason of alleged malice, fraud, oppression or gross negligence of defendants and their wilful and wanton disregard of plaintiffs rights; you are further instructed that if you find from the evidence herein that defendants, or either of them, are guilty of the alleged trespasses complained of herein, and further find that such defendants or defendant, acted thru malice, fraud, oppression, gross negligence or in a wilful and wanton disregard of plaintiffs rights, then you may allow in addition to actual damages, such further amount and sum, by way of punitive damages, as under the instructions of this court and in your sound judgment, you deem proper.

You are further instructed that punitive damages are imposed in such case without regard to and not as a part of

actual damages; but that they may be allowed by way of punishment of such defendants, or defendant, for the general good of society, to deter such defendants or defendant from the doing of such acts and committing such injuries against others. You are further instructed that you may consider the financial wealth and standing of the defendants or defendant as you may find guilty of such malice, fraud, oppression, gross negligence, or wilful and wanton disregard of plaintiffs rights, as a means of determining the amount of such punitive damages as are necessary, by reason of such financial standing, to punish such defendant and deter him from the committment of like trespasses against others. You are further instructed that you may assess different amount of punitive damages, against different defendants, if you find more than one of such defendants liable to such punitive damages.''

No. 5. ''The plaintiffs claim that the damages sustained by them were committed wilfully by the defendants and in wanton disregard of their rights. On this account they ask for punitive damages. For the purpose of inquiring whether they are entitled to such damages you have a right and should inquire into the motive of the defendants in entering upon said lands and may take into consideration the lease from plaintiffs to G. H. Paul which has been admitted in evidence. If you believe that the defendants entered upon said lands in good faith, believing that said lease gave them the right to do so, then you shall not allow any damages except the actual damages sustained by the plaintiffs by reason of the trespass. It is a matter in your discretion whether you shall or shall not assess punitive damages, and if you decide to give such damages, the amount thereof is to be fixed at such amount as you deem proper, for the purposes stated in another instruction, within the limits of the amount claimed in the petition.''

Said 4th instruction is criticized, and, in the same connection, an instruction numbered 2 that was given, on the

ground that their effect was to direct a verdict for the plaintiffs, without considering the question of estoppel raised by the pleadings and the evidence, or the question of the right of defendants under the alleged lease; and also to lead the jury to understand that upon finding that actual damages had been sustained, it would then become their duty to assess punitive damages, and to do that in proportion to the relative wealth of the different defendants. And the argument in that respect is that the 4th instruction, in one place, announces the erroneous presumption that plaintiffs have been injured by the acts of defendants, requiring actual damages to compensate them therefor, leaving the jury without any discretion to consider alleged justification. The second instruction, to be considered in this connection, was as follows:

"The defendants admit that they went upon said lands. Therefore, your verdict must be for plaintiffs, and it is your duty to find the actual damages sustained by them by said acts, unless you believe from the evidence that the plaintiffs consented to the acts of defendants."

The 4th instruction is not, in our opinion, properly subject to the criticism that it declares, as a legal presumption, that the plaintiffs were injured or that they are entitled to actual damages. Nor do we believe that the jury may have so understood it, especially when considered in connection with the other instructions. The court was attempting, by the first part of that instruction, to state the difference between actual and punitive damages; and the word "presumption" in connection with actual damages was evidently used to explain the theory upon which they were "claimed." For it was said in the instruction that such damages *claimed* "are based on the presumption" of injury. Perhaps the idea might have been more clearly expressed, but we see no reasonable ground for assuming prejudice to have resulted from the use of said word. Evidence to show general and special actual damages was introduced and re-

ceived in evidence, and we think it highly improbable that any part of the amount assessed for actual damages was allowed on the basis of a mere presumption of injury.

The objection that either of said instructions erroneously assumed the acts of defendants to constitute a trespass, ignoring the evidence as to alleged justification or the good faith of the defendants, is not, we think, well taken, for reasons which will appear as we proceed with the discussion of the sufficiency of the evidence to justify, or propriety of the instructions permitting, exemplary damages. But it may be said here that so far as either instruction assumed the fact of trespass, it was only with respect to *actual* damages, and by the 5th instruction the good faith of defendants was required to be considered in determining the questoin of exemplary damages; the jury being directed thereby not to allow such damages upon finding that the entry was made in good faith. The plaintiffs introduced in evidence a record of another and previous suit between them and the Hall Oil Company, including the final judgment therein rendered shortly after the alleged trespass, declaring invalid and cancelling the lease under which defendants claimed to have entered upon the land in good faith. Upon the introduction of that evidence the court announced, as its understanding at that time, that the judgment was res judicata upon the matters determined thereby. And there would seem to be no doubt of the correctness of that understanding, for reasons presently to be stated; and the second instruction aforesaid, which was given by the court of its own motion, was, we may assume, based upon the evidence as to that suit, considered as establishing the title and right of possession in the plaintiffs at the time of the alleged trespass. But the instructions in that particular were clearly not intended to and did not affect the question of the recovery of punitive or exemplary damages.

The actual entry upon the land, the moving thereon of the drilling rig and equipment, and the conducting thereon of the drilling operations, were the direct acts of the de-

fendant, The Midwest Refining Company, through defendant Eddy, then its superintendent in that field, and others under his supervision. And those acts were done for, or by the authority of, the defendant, The Hall Oil Company, under a contract dated April 30, 1918, providing for the development and operation of said premises and other lands for oil and gas purposes. That contract recited that the Hall Oil Company ''owns and controls,'' as lessee, certain lands described in an attached schedule, which described the premises herein involved as follows:

''That certain lease dated September 11, 1915, for a term of 10 years, between James Barquin and G. H. Paul, covering the SW¼ NE¼ and SE¼ of NW¼ of Section 26, Township 3 North, Range 1, West, Wind River Meridian, containing 80 acres. On July 5, 1916, Paul assigned said lease to John Dillon and on September 2, 1916, John Dillon assigned said lease to Hall Oil Company.''

And it provided that said Midwest Company shall have the field and operating management and control of all of the Hall Oil Company's rights, title and interest in and to the lands mentioned in said schedule, that it shall develop and operate said property, and maintain thereon one complete drilling outfit continuously at work until the lands shall have been fully developed in accordance with the usual and recognized practice of the oil industry, and such additional drilling outfit thereon as may be required to conform and comply with the terms and conditions of the leases under which said lands are held, or as may be required to protect the lines and boundaries thereof, and the premises from drainage by commercial wells on adjacent property within 200 feet from said lines, and will cause to be done thereon all proper acts and things necessary to put said property on a producing basis in accordance with the usual practice of the oil business. It contained also a provision to the effect that the party holding the lease shall advise said Midwest Company in writing not less than four months in ad-

vance regarding the drilling of any well or wells on its premises covered by the contract, in order to protect and maintain any said lease in accordance with its terms and provisions.

It was shown upon the trial by a letter from the said Midwest Company's general superintendent addressed to counsel for plaintiffs, and in effect, at least, conceded that the said drilling was by authority of the said lease to Paul, assigned by him to Dillon and by the latter to said Hall Company. It was also shown that on July 25, 1917, one of the plaintiffs, James Barquin, served upon an officer of the Hall Oil Company at its office in Riverton, Wyoming, a written notice from the plaintiffs addressed to said company referring to said lease and another—a prior lease—covering the same premises, stating that each was null, void, and of no force and effect, that each had been forfeited, and constituted a cloud on the title of plaintiffs to their damage, and demanding that said company immediately remove said cloud by executing "a good and sufficient release." Also, that upon the refusal of such demand, a suit was filed by plaintiffs against said company in said district court on August 9, 1917, wherein the said leases were cancelled. And certain papers and proceedings in that suit, including the judgment, were then introduced and received in evidence, whereby it appeared that the suit was brought for the cancellation of the leases aforesaid and for damages for the refusal to cancel them on the record. It was alleged therein that the so-called Paul lease was null and void, and had been abandoned and forfeited; that it was void *ab initio* for certain stated reasons, and that its execution was the result of a mutual mistake in that neither party thereto then knew of the existence of the former lease; and that it covered "homestead premises," without any release or waiver thereof by the lessors.

That case, we know, came to this court on appeal from a judgment therein in favor of the defendant upon the causes of action averring and seeking to recover damages, and that

judgment was here affirmed; and said lease was referred to in the opinion. Barquin v. Hall Oil Company, 28 Wyo. 164, 201 Pac. 352, 202 Pac. 1107. The second amended petition upon which that cause was finally submitted for judgment upon the causes of action for the cancellation of the leases, was first introduced and received in evidence and then the original petition. Upon the court declaring, when the latter was offered, that it would be admitted, and counsel for defendants expressing a doubt as to the propriety of its being received, the court stated its understanding to be that the paper was offered for the purpose of showing the date of its filing. There was then introduced the answer to said second amended petition, which appeared to have been verified on January 9, 1919, but the endorsements thereon are not copied into the record here, therefore the exact date of its filing is not shown. It may be assumed, however, that it was filed on the day of its verification or the following day, for the judgment was rendered on January 10, 1919.

The defendant the Hall company, by its answer therein, had admitted the alleged ownership and possession of the plaintiffs; that the leases were forfeited and abandoned by defendant, and rescinded before the defendant had developed or attempted to develop the said leased premises for oil or gas, and that both are null and void; and expressly admitted as to the Paul lease that ''in truth and in fact, said lease and assignment thereof were null and void ab initio, and of no force and effect.''

Those facts appearing from the pleadings aforesaid, the judgment was then introduced. It recites the taking of evidence, that the defendant in open court admitted it had forfeited and abondoned both leases, that at the time of the commencement of the action, both were null and void, of no force and effect and not binding on either party, ''and that at that time the defendant had no interest, right, title or estate in and to said leased premises under and by virtue of said leases, or either of them.'' And it recites further that defendant consents. that the leases be cancelled, and

authorizes and directs the entry of judgment cancelling
them.   Following that it is recited that upon said admis-
sions and the evidence, the court finds that all of said facts
and admissions are true; that the plaintiffs at the time of
the commencement of the action were "and now are" the
owners in fee simple of said premises; that in truth and fact
said leases were, and now are, null and void, of no force
and effect, and not binding upon either party, and that the
record thereof constitutes a cloud on plaintiffs' title.   And
thereupon it was ordered, adjudged and decreed that said
leases and each of them be and "are hereby" cancelled and
annulled, and the plaintiffs restored to the full and abso-
lute title and possession of said leased premises; that de-
fendant and all persons claiming under it or under the
leases be forever debarred from claiming or asserting any
claim, right, title, interest or estate therein; and that the
county clerk and ex-officio register of deeds in and for Fre-
mont County be ordered to release said leases and satisfy
the record thereof.

Immediately following the introduction of said pleadings
and judgment in the former suit, counsel for plaintiffs
moved for an instruction that said judgment "is res judi-
cata as to all matters;" and the court, upon objection,
stated that he could not then instruct the jury, but added:
"All I can do is to indicate, as far as I can see now, that
would be my holding."   To that counsel for defendants ex-
cepted.

We have, then, in the order of their occurrence the fol-
lowing proven or conceded material facts:   On September
11, 1915, the plaintiffs executed an oil and gas lease cover-
ing the lands in controversy to George H. Paul, for a stated
period of ten years, which was afterwards on July 5, 1916,
assigned by Paul to John Dillon, and by the latter, on Sep-
tember 2, 1916, to the Hall Oil Company.   That instrument
contained a provision, not hereinbefore stated, obligating the
lessee to commence operations within three years and com-
plete a test well within four years, or in lieu thereof to pay

the lessors $100 per annum payable annually in advance until the completion of the test well. On July 25, 1917, the notice aforesaid, declaring the lease null and void, of no effect, and forfeited, and demanding its cancellation of record, was served upon the Hall company. On August 9, 1917, the aforesaid suit against said company to cancel the lease and for damages was commenced. On April 30, 1918, and during the pendency of said suit, the contract between the Hall company and the Midwest company for the development of the premises by the latter in conformity to said lease was executed. That was followed by the entry of the Midwest company upon the land on or about September 1, 1918, and the commencement of actual drilling thereon on September 9, which was continued ''until the hole was completed, October the thirteenth'' of that year, as one of the principal witnesses for defendants testified. The well did not result in producing or finding oil or gas. It was plugged and abandoned, but was left in condition to be used as a water well by plaintiffs, and, as testified by witnesses for defendants, that was done at Mr. Barquin's request. And thereafter, in January, 1919, the final pleadings were filed and judgment aforesaid entered in the suit to cancel the leases.

The defendants in the court below in this case filed separate answers, setting forth in each the leases executed for the development of the land for oil and gas, including the Paul lease, the contract aforesaid between the Hall and Midwest companies, and that the Midwest company entered and placed a complete drilling rig and equipment upon the land, intending to comply with the terms of said Paul lease, and that they drillqd a well to the sands, which, in that neighborhood, had produced some oil, but that those lying underneath these lands were found to be barren of oil. Each pleaded also an equitable estoppel, alleging the drilling to have been done with the knowledge, consent and acquiescence of the plaintiffs; particularly that the plaintiffs had requested the defendants to so drill and plug the well as to

leave them a water well in case oil was not found; and that the plaintiff James Barquin selected the point for drilling. But these points were submitted to the jury upon the evidence and decided against the defendants. Thus, one of the court's instructions was that if the entry and the placing of drilling machinery and drilling of a well upon the premises was with the consent or permission of the plaintiffs, and that they were willing to have the well drilled for the purpose of determining the oil bearing character of the premises, or of leaving a water well for their use, or for any other purpose, then a trespass was not committed by the defendants, and they would not be liable for any damages that usually result from such operations. And the evidence as to the facts of such consent, or acquiesence, was at least conflicting. And we do not understand that counsel for plaintiffs in error are now insisting upon a reversal based upon the insufficiency of the evidence to support the jury's finding as to those matters.

Indeed, as said above in opening the discussion of the case upon the merits, it does not seem to be seriously contended that the evidence is insufficient to establish the fact of trespass entitling the plaintiffs to *actual* damages, within the allegations of the petition. However, in the absence of sufficient evidence to establish such consent or acquiesence, the entry and acts upon the land complained of would constitute a trespass authorizing the recovery of actual or compensatory damages as the natural and logical effect of the admissions and judgment in the suit aforesaid brought against the Hall Oil Company to cancel the Paul and other leases, if for no other reason. It is argued here that the judgment in said case would be res judicata only as to the fact of the invalidity of the lease at the date of the judgment; that while the findings respecting its invalidity ab initio might furnish a ground for its cancellation they would not be controlling upon the question of such invalidity from the beginning; and that neither such findings nor the

judgment should be held binding upon the Midwest Company, not a party to the suit.

We are not prepared to agree with the contention that the conclusive effect of the judgment upon the question of the title or right of possession, as between the parties in this case, could not cover acts occurring prior to the date of the judgment. Certainly the Hall company's admissions in said suit, and the findings of the court thereon and upon the evidence, that the leases were null and void and not binding upon either party at the time of the commencement of said action, and that said company at that time had no valid claim, interest or estate in and to said premises by virtue of either of said leases, must be here held binding and conclusive upon that company at least. The Midwest company defends alone upon one of the leases so admitted and declared to be invalid; and the contract under which it entered upon the land and conducted the drilling operations was made with the Hall Oil Company during the pendency of said suit in the same court and in the same county as that in which these lands are situated and this action was brought and determined, or at least after the filing of the petition in that suit. And our statute provides that when the summons has been served, or publication made, the action is pending so as to charge third persons with notice of its pendency, and while pending, no interest can be acquired by third persons in the subject matter thereof as against the plaintiff's title. Comp. Stat. 1920, Sec. 5644.

It is true that the record here fails to show when the summons in that action was served or the date of the first appearance of the Hall company therein. For none of the papers which might have shown those facts were introduced in this case, though all were apparently in the presence of the court at the trial, in the custody of its clerk then being examined as a witness to identify the record in that suit. But the Hall company being clearly bound by the decree, it is difficult to understand how its contract with the Midwest company for development work could confer upon the

latter a right which it might insist upon in this suit, so far as the mere question of trespass and the right to actual damages therefor are concerned. It might furnish a ground for a defense of good faith as against a claim for exemplary damages, and the jury were so instructed; the recoverable damages being expressly limited by the 5th instruction, above quoted, to actual damages, if the jury should find that the defendants entered in good faith, believing that the Paul lease gave them the right to do so.

Upon that question of good faith, the jury found against each of the three defendants, now here as plaintiffs in error, and we are unable to say that the evidence is insufficient to sustain the verdict in that respect. The Hall company certainly knew of the Barquins' claim that the lease was void and of no effect through the notice served upon it in July, 1917, and the suit brought for its cancellation, assuming, as seems to have been understood, if not assumed, upon the trial, that the proceedings necessary to commence the suit occurred, as well as the filing of the petition, in August, 1917. And before beginning the drilling of the well, the Midwest company and its superintendent Eddy had like knowledge, through a written notice dated September 3, 1918, signed by Martel and Lee, who claimed therein to have purchased the Barquin oil, gas, and other mineral rights in the premises, and also by the plaintiffs under a statement that they joined in and confirmed that notice; that notice stating that any former lease or leases for oil and other minerals on the premises had been forfeited and abandoned, and were null and void. And there was testimony to the effect, which, although disputed, the jury may have believed, that Mr. Barquin verbally protested against the entry upon the premises of Eddy and his company when first informed of their purpose in that regard. And that these three defendants co-operated in the entry, or admitted responsibility therefor, was established at the outset of the trial by the answer of each to interrogatories appended to the petition and read in evidence. Thus, the Midwest

company answered in substance that they went upon the premises to drill for oil, gas or other minerals and that the drilling was done by said company, by whom Mr. Eddy was employed, under a contract with the Hall Oil Company. The defendant Eddy's answer was substantially the same; and he testified also the same effect. The Hall Oil Company's answer to the first interrogatory admitted going upon the premises during the times mentioned in the petition to drill for oil, gas or other minerals, and to the second interrogatory answered: "Drilling was done by the Midwest Refining Company, by whom Mr. Eddy was employed, under a contract with the Hall Oil Company."

We have in mind upon this question also other evidence which will presently be referred to, proper to be considered generally, in connection with facts already stated, upon the question of the propriety of any award of exemplary damages. And it may now be stated as our opinion, upon all the facts in the case, and the evidence as it went to the jury, that the court was warranted thereby in submitting to the jury, through proper instructions, the matter of allowing such damages. And we find no fault in either of the instructions upon that subject, from the standpoint of the technical well-settled rules of law controlling, generally, the right to recover such damages, so far as we understand what was intended thereby. Cosgriff v. Miller, 10 Wyo. 190, 68 Pac. 206, 98 Am. St. Rep. 977. We shall, however, have something to say concerning them when discussing the contention that the amount allowed is excessive.

We think it advisable to state enough of the evidence to show the situation and purpose of the parties at the time of the trespass. Some of the evidence is conflicting, but the jury passed upon it in favor of the plaintiffs, and that they might reasonably do that within their province to pass upon the facts and the credibility of witnesses does not seem open to question. There was no evidence of personal malice or ill-will against the plaintiffs, on the part of either defendant, unless a conversation occurring in July, 1917, to be re-

lated, might be thought to indicate some such feeling at or before the trespass on the part of the Hall Oil Company. Nor do we think the evidence shows any act of oppression or conduct unusual to the work of drilling an oil or gas well. Some of the acts in that connection were complained of and alleged as grounds for special damages, and evidence was produced in support thereof. And we may assume that they were covered by the amount allowed for actual damages. But the circumstances under which the entry was made, and the drilling done, justified, we think, a finding of legal malice as the result of an unlawful act, wilfully done, in view of the general finding for plaintiffs. And we think there was sufficient evidence also to justify a finding that the acts constituting the trespass were committed with a reckless disregard for or a wilful indifference to the rights of the plaintiffs. In other words, the jury might reasonably have found, we think, upon the evidence introduced by the plaintiffs, if believed, that the defendants assumed the attitude of intending to drill the well upon the premises, whatever their rights under the lease, whether any or none, deeming it sufficient justification that they were able to pay any damage that might result therefrom, if it should ultimately be determined that they had no right whatever upon the land.

Referring first to the occasion of the service of the notice upon the Hall Oil Company, above adverted to, Mr. Barquin testified that when said notice was served at the company's office in Riverton in said Fremont County, the officer of that company upon whom it was served first declared an intention not to cancel the lease on the record, and then "shook his fist at me" and said "Jimmy, you won't look like anything when I get through with you, * * * you will look like dog meat before I get through with you," and acted as though he might hit him. And he was corroborated in that by other witnesses who were present at the time. He further testified that about September 1, 1918, Mr. Eddy came to his place and said that "we are going to

drill a well," to which the witness replied that he was not
going to drill it there, that Mr. Eddy then said that it was
"no use you and me having an argument; I am just work-
ing for the Midwest; I got to do what they tell me or quit,
and the best thing you can do is fall back on them.   They
sent me down here to drill this and I got to do it."   The
witness then continued "Well, I say, if you have to I guess
I have to file a suit against them.   He say, you can go
ahead, but I got to drill this place.   Well, go ahead then,
if you got to do it, I am not going to get a gun.   *   *   *
I say, I guess I will go to town and see a lawyer.   *   *   *
And he said, Jimmy, you are foolish to start a suit against
a company like this, and you know the first thing you will
do, you will lose your money and never get a second chance
like this.   He say, you sold your mineral rights, and I say,
I am standing behind that title, and I can't have a clear title
and I can't give a clear title if the Midwest drills this; and he
says, if you take my advice, don't spend a dollar against
this company, because lots of fellows have lost all they had
with a big oil company like this, and the best thing you can
do is go back, and I said, that being the case, a poor man
aint got even a say-so about his home, and he says, its a
hard proposition when you go against the Midwest or any
oil company or any of those companies.   *   *   *"

Mr. Lee testified to a conversation that he had with the
defendant Eddy, Mr. Martel being also present.   Among
other things he testified that Mr. Eddy said:

"It's simply this way between us three; there is no need
of us having any hard feelings at all; I am working for the
Midwest company and I have orders to follow,   *   *   *.
I got to do what they say   *   *   *, and until I am put off
here with a gun force, or an officer leads me off, I am going
to stay and follow those orders; I   *   *   *   told him that
I hadn't ever killed anybody for any such a thing as that,
and told him I didn't blame him a whole lot for the posi-
tion he took on the subject, but I told him that the court

would have to look into it, for we didn't sanction the business of them being there at all. He said he had his orders and was going to follow them out unless somebody put him off with a gun.''

That witness further testified that Mr. Eddy said that if the court settled the matter, the Midwest employed the best lawyers in the country, and they have plenty of money to pay for the damages. Mr. Martel testified that Mr. Eddy said that he had received instructions from the Midwest company to drill that well and that he was going to do it, that he thought we were acting very foolishly, that the Midwest company were a responsible company and that the court would decide in due time if they had any right to come in on that land, and that if they didn't have any right, they had plenty of money to pay for damages that might be done, and that ''he was instructed to go ahead and do the drilling,'' and he said ''I am going to go ahead, even if you shoot us off.'' He further testified that he then told Mr. Eddy that they were not gun men, and that he must remember that he had entered there over their protests, that he was then there over their protests, and always would be.

It is only fair to say that Mr. Eddy denied saying some of these things. As to the first conversation with Mr. Barquin, he testified that the latter made no protest, but went with him upon the land and advised as to where the well should be located. And Mr. Barquin also stated that after he had protested he went with Mr. Eddy and they talked about a place to drill. But as we understand his testimony, his purpose was then to keep the well from his garden. But Mr. Eddy testified as to the conversation with Martel and Lee that he said, in response to Mr. Martel's statement that the Midwest company had no right to drill upon that property: ''I don't know as to that, only believing by my instructions that they have, and he still insisted that they didn't have any right on the property, but I told him I didn't know exactly myself whether they had or didn't, and I further

said to Mr. Martel that you must understand that I can't
tear this rig down and pull it off of this property without
any authority to show me that the company didn't have any
right in there; * * * that he wasn't going to have any
trouble over it, that if they insisted that we do go off, we
will go and find out who has the right, and Mr. Martel start-
ed away, also Mr. Lee, and he, (Martel) said, we will look
further into this.'' And that conversation, Mr. Eddy testi-
fied, occurred before the service of any written notice up-
on him.

That there are two kinds of malice,—malice in fact and
malice in law,—is well settled. 18 R. C. L. 2; Lamport v.
Drug Co., 238 Mo. 209, 141 S. W. 1095; Ann. Cas. 1913 A
351; 37 L. R. A. N. S. 533. In its legal sense, malice has
been variously defined, one definition stated in R. C. L.,
above cited, being ''the intentional doing of a wrongful act
towards another, without legal justification or excuse;''
and another ''a condition of mind which shows a heart re-
gardless of social duty and fatally bound on mischief, the
existence of which is inferred from acts committed or words
spoken.'' And it has been said that a wrongful act done
with a reckless indifference to the rights of others ''is equiv-
alent to an intentional violation of them,'' authorizing such
exemplary damages as the circumstances require. M. & St.
P. Ry. Co. v. Arms, 91 U. S. 489, 23 L. ed. 374. The Su-
preme Court of Oregon in Kingsley v. United Rys. Co., 66
Ore. 50, 133 Pac. 785, said this about an unlawful entry
upon lands:

''To go unbidden upon another's lands, appropriate a
part, and change the physical aspects thereof in contraven-
tion of the expressed wishes of the owner, constitute acts so
violent to wholesome legal restrictions as to come within
the rule permitting exemplary damages.''

And that language was used in disposing of an objection
to and sustaining an instruction stating that if the jury
should determine that the defendant has acted ''with· a

total disregard of the rights of the plaintiff,'' then they might assess ''what are known as punitive or exemplary damages to deter this company, and all other people, from doing acts of this kind in the future.''

In Mossback v. Smith Bros. Sheep Co., 210 Pac. 910, the Supreme Court of Montana, sustaining an instruction upon the subject of exemplary damages, said that '' a trespass after being forbidden is willful and malicious;'' and quoted from Wills v. Noyes, 12 Pick. Mass. 324, the following language of Chief Justice Shaw:

''Whatever is done wilfully and purposely, if it be at the time wrong and willful, and known to the party, is in legal contemplation malicious. That which is done contrary to one's conviction of duty, or with a willful disregard of the rights of others, whether it be to compass some unlawful end, or some lawful end by unlawful means, or, in the language of the charge, to do a wrong and unlawful act, knowing it to be such, constitutes legal malice.''

And thereupon, following a citation of other authorities upon the same point, to which we need only refer, the Montana court further said that, exemplary damages being claimed, where the acts are shown to be of such a character as to indicate a reckless disregard of the rights of the plaintiff, a reasonable amount as punitive damages may be awarded. In 38 Cyc. 1143-1146, it is said, among other grounds for allowing exemplary damages, that they may be given when the act was committed forcibly and against protest; and that they may be awarded even where the trespass was under claim of right in good faith, where there are circumstances of aggravation. And some of the cases cited in the note in support of that statement seem to be more or less in point upon the facts here.

Thus, in Beaudrot v. Southern Ry., 69 So. Car. 160, 48 S. E. 106, the defendant justified upon a claim of a right of way, the legality of which claim it failed to establish, and

was assessed a small amount over $1000 by way of exemplary damages, the actual damages having been about $2.50, and it was contended that the trial court had erroneously held when denying the motion for a new trial that a verdict for punitive damages could be supported without proof of malice or gross negligence, though the trespasser was acting in good faith, in the attempted enforcement of a supposed right. The appellate court said:

"The opinion of the circuit judge, stated on this subject in refusing the motion for a new trial, was that a trespasser, though acting in honest belief of a right, may be so grossly negligent in ascertaining his rights that his attempt to make good his claim by force should be regarded as a wanton and reckless invasion of the possession of the real owner. This was a correct statement of the law."

In Louisville and Nashville R. R. Co. v. Smith, 141 Ala. 235, 37 So. 490, an action for trespass by a railroad after a written protest of the land owner, the court said that it appeared from the agreed statement that the defendant did not know whether the company by which the railroad was originally built, or any of its successors before the defendant acquired it, had any conveyance for its right of way through the premises, nor whether there had been any condemnation proceeding, but the railroad had been built through the premises "either by the license or let of the original owners, and has from that time until now, as aforesaid, claimed, owned and operated its railroad through said premises." The court held that such "license or let" did not appear to have amounted to more than permission by the landowners for the building of the road, and could not operate to convey the land or create an easement, unless coupled with a grant or contract; thereby holding that defendant had not shown a title. But notwithstanding such agreed fact, and the fact of the claim of right of way when the act complained of was committed, the court upheld the

right of the plaintiff to damages which had been assessed in the sum of $1000, and said:

"From the evidence the jury might well have found the ditching was done not inadvertently, but in intentional disregard of a written protest giving notice of plaintiff's rightful occupation of and claim to the land and without any offer or purpose on defendant's part to make compensation. From these facts there might have been drawn an inference of malice, to which the further fact that the work was necessary for the proper maintenance of the road was not opposed with such conclusiveness as would have warranted the withdrawal from the jury of the question of malice and exemplary damages. The complaint avers, and the evidence showed such a violation of plaintiff's property and property rights as would have entitled her to recover at least nominal damages irrespective of whether damages greater than nominal were acutally sustained, and in such case, the existence of such greater actual damages, is not, under the law as declared in this state, an essential predicate to the imposition of exemplary damages."

In a later Alabama case, Goodson v. Stewart, 154 Ala. 660, 46 So. 239, it having appeared that the defendant claimed under a contract for the removal of timber and hence permitting an entry upon the land, it was held by the court to afford no justification because all right thereunder had been lost by lapse of time, and thereupon the court said:

"Whether plaintiff was entitled to exemplary damages, on the case made, was a question for the jury. There was testimony tending to show a warning of these defendants by the plaintiff not to go upon the lands described in the complaint. This condition of fact, if found, cannot be distinguished from that presented in L. & N. R. R. Co. v. Smith, 141 Ala. 335, 37 So. 490, upon which this court based

the announcement that it was open for the jury to find that legal malice, essential to the imposition of exemplary damages, accompanied the trespass.''

In the Kentucky case of City of Clinton v. Franklin, 119 Ky. 143, 83 S. W. 142, it appeared that the city authorities, without the plaintiff's consent, had entered upon land of which he was the alleged owner and in possession, ''digging up the soil, tearing down the fence, and constructing thereon a plank sidewalk;'' said officials claiming the right to do that under a city ordinance. Holding that they had no such right, the court of appeals said:

''We do not think there is any ground upon which to rest the claim made by appellant that in committing the acts of trespass complained of, it acted in good faith for the benefit of the public, and under the belief that the ground upon which it constructed the sidewalk was a part of the street, and not the property of appellee, for it is shown by the evidence that its officers and agents were repeatedly notified by appellee, before they began to construct the sidewalk, that they were preparing to place it upon his lot, and warned not to do so, to all of which they gave no heed, but persisted in putting it upon his land, in doing which they ignored his rights, and neglected every means of informing themselves as to the true location of his boundary line.''

In Cumberland Tel. & Tel. Co. v. Cassedy, 78 Miss. 666, 29 S. O. 762, it was held that where, notwithstanding the refusal of the owner of the property to consent thereto, the tops of certain shade trees were cut out because in the way of the defendant's telephone wires, under a claim of authority therefor from the city council, and direction of the city marshal, punitive damages were held proper; though the amount allowed was held excessive and a new trial awarded unless the excess over a stated sum should be remitted. And, notwithstanding the fact that appellant had the authority of the city council and marshal, the court said:

"If the servants of the telephone company, in the presence of the appellee, had, in disregard of his protest, cut and mutilated his trees, we think such a wilful wrong had been inflicted upon him as would have justified exemplary damages; that they refrained from so doing in his presence, but returned in his absence and committed the injury forbidden, is and was a fraud upon his rights that clearly authorized the finding of punitive damages."

In Clark v. Milligan, 28 B. C. 22; Vol. 1, 1920, Western Weekly Reports, 1044, where a purchaser of timber from another's land had, under his contract, only until a certain date to cut and remove the same, an award of exemplary damages against the purchaser was held proper for cutting the timber after said date; and he was also held liable for erecting a lumber camp on the vendor's land, which the purchaser erroneously claimed was within the limits of a public highway created by statute, but the existence of which highway the court held upon the trial had not been established.   The court held contrary to defendant's contention that time was not of the essence of the agreement; and, notwithstanding his claim of entry as of right, the court held him liable for exemplary damages.

The question of a claim of good faith of an entry was considered also in Richwine v. Presbyterian Church, 135 Ind. 80, 34 N. E. 737, where the action was to enjoin the taking of possession, and there was a supplemental complaint for damages, alleging that since the commencement of the suit the defendant, with knowledge of plaintiff's rights, had entered upon and taken possession of the land, made excavations, removed fences, and erected buildings and other structures thereon.   The case did not, apparently, involve the question of exemplary damages, the damages awarded being nominal only, in connection with a decree giving the property to the plaintiff.   But what the court said as to the claim of good faith, may, we think, be properly referred to as in point here, viz:

"Nor can it be said, as counsel for appellant contend, that appellant acted in good faith in entering upon the disputed territory and erecting his building thereon. This entry was made and the buildings erected by him, after the filing of appellee's original complaint, and against the express prohibition of appellee. Appellant acted with his eyes open, and at his own peril. He was not taken advantage of, nor unawares; but, after suit was brought to enjoin his entering upon the premises, he deliberately proceeded to do what the court was about to decide whether he had a right to do or not. The court having decided against him, he cannot now be heard to claim that he was an occupant in good faith; he took the hazard, and must abide by the result. The court, undoubtedly, took all equities of this nature into consideration, in awarding appellee's damages at one cent, for the case disclosed more than nominal damages to appellee."

Other authorities in point upon the question are: The early and a leading English case upon the subject of exemplary damages, Huckle v. Money, 2 Wilson 206, 95 Eng. Reprint, 768; Shores v. Brooks, 81 Ga. 468, 12 Am. St. Rep. 332; Raynor v. Nims, 37 Mich. 34; 26 Am. Rep. 493; Best v. Allen, 30 Ill. 30, 81 Am. Dec. 338; Reader v. Purdy, 41 Ill. 279; Barry v. Edmunds, 116 U. S. 550; 4 Suth. on Dam. (4th Ed.) Sec. 1032. It is said in the cited text that though an entry is made upon real estate under a conviction that the right to do so exists, if it is in fact wrongful, and wilful injury is done to the plaintiff's property, the defendant will be liable for exemplary damages; but that if the defendant was entitled to the possession at the time, that fact should be taken into consideration in determining the amount of such damages. Chief Justice Bleckly, in the cited Georgia case, stated the facts to be that a landlord broke open his tenant's house and took therefrom a large amount of cotton in the seed; the excuse being that the tenant had not paid the charges to which the cotton was subject and would not sell or market it as soon as the landlord

thought desirable; and stated as the court's conclusion that if the cotton was subject to such charges, the landlord had his remedy at law, but had no right to act as his own sheriff in making the seizure; that though the end which he had in view was not improper, he was bound to the observance of proper means, and that he committed a trespass for which punitive damages might be awarded. It was held in Best v. Allen that exemplary damages may be given against a defendant who wilfully damages plaintiff's goods, notwithstanding that the defendant's entry upon the premises where the goods were situated was in good faith, supposing he had a right to make such entry. The court said:

"Here was an unwarrantable attempt by the defendant to take the law into his own hands, in a case where he had no right to take the possession, and even if his title had been good, he should have brought ejectment to obtain the possession."

The rule is stated in Corpus Juris (17 C. J. 985) that where an act is done in good faith there can be no recovery of punitive damages, but that a mere belief in the right to do the act cannot shield a person where there is no reasonable ground for it, nor if the act is done in a wanton and outrageous manner. As we have held above, the facts shown in evidence were sufficient to warrant the jury in finding that the purpose of defendants was to drill a well upon the land regardless of their legal right to do so, even though they may have believed at the time that the lease gave them a legal right. And, beyond that, the verdict discloses that the jury found against the defendants upon the facts as to the matter of their alleged good faith.

4. It has been disclosed in the fore part of this opinion when discussing the questions of practice submitted, that one of the grounds in the motion for a new trial was excessive damages appearing to have been given under the influence of passion or prejudice. That is a ground for a new

trial under our statute. Comp. Stat. 1920, Sec. 5870. And it is strongly contended that the amount of the exemplary damages allowed is so unusually large and so disproportionate to the amount of the actual damages and the greatest possible value of the land, as to certainly indicate that it was the result of prejudice or passion on the part of the jury.

We think it may be assumed, without much discussion, that since the statute has declared that a new trial may be granted upon the ground above stated, without distinguishing between different kinds of damages, a new trial may be granted upon that ground where the objection relates only to punitive or exemplary damages, though the allowance and the amount of such damages is generally left to the discretion of the jury. For that discretion is not arbitrary or unlimited. 17 C. J. 993, 994. It is said in 8 R. C. L., at page 680:

"At common law the amount was left almost entirely to the jury, and the courts generally refused to grant a new trial on the ground that the award was excessive, and would do so only in a glaring case of outrageous damages, and which all mankind at first blush must think so. It is now generally held, however, that the jury is not at liberty, unrestrained, to award by way of punitive damages, any amount, regardless of how large it may be. While their verdict will not be set aside, unless it is so large as to satisfy the court that it was not the result of an honest exercise of judgment, an award of exemplary damages is subject to revision by the court to the same extent as awards of compensatory damages, and will be set aside if it is grossly excessive or appears to be the result of passion or prejudice or improper sympathy."

In an able discussion of the matter of setting aside verdicts for damages generally, it is said in Chesapeake & O. Ry. Co. v. Arrington, 126 Va. 194, 101 S. E. 415, that it is

an ancient and accepted doctrine of the common law that judges have the power and are clearly charged with the duty of setting aside verdicts, where the damages are either so excessive or so small as to shock the conscience and to create the impression that the jury has been influenced by passion or prejudice, or has in some way misconceived or misinterpreted the facts or the law which should guide them to a just conclusion.   The theory upon which punitive or exemplary damages are generally held in this country to be allowable, is that of punishment of the offender and a warning to others.   Cosgriff v. Miller, supra; Lake Shore etc. Ry. Co. v. Prentice, 147 U. S. 101; 13 S. Ct. 261, 37 L. ed. 97; Scott v. Donald, 165 U. S. 58, 17 S. Ct. 265, 41 L. ed. 632. The court said in the case last cited:

"It is a well established principle of the common law that, in actions of trespass and all actions on the case for torts, a jury may inflict what are called exemplary, punitive or vindictive damages upon a defendant, having in view the enormity of his offense rather than the measure of compensation to the plaintiff.   We are aware that the propriety of this doctrine has been questioned by some writers, but if repeated judicial decisions for more than a century are to be received as the best exposition of what the law is, the question will not admit of argument.   By the common law, as well as by statute law, men are often punished for aggravated misconduct or lawless acts, by means of a civil action, and the damages inflicted by way of penalty or punishment given to the party injured.   In many civil actions * * * the damages assessed depend upon the circumstances, showing the degree of moral turpitude or atrocity of the defendant's conduct, and may properly be termed exemplary or vindictive rather than compensatory.   In actions of trespass, where the injury has been wanton and malicious, or gross and outrageous, courts permit juries to add to the measured compensation of the plaintiff * * * something farther by way of punishment or example, which has sometimes been called 'smart money.' "

In the case at bar the financial condition or wealth of each of the defendants, a matter permitted to be shown by our decisions where exemplary damages are claimed, was shown by the individual answers of each defendant to questions propounded to them by interrogatories appended to the petition, which were read in evidence, whereby it appeared that "the combined capital and surplus" of the Midwest Refining Company was $67,651,182.72; that the "financial worth of Hall Oil Company was estimated to be 'about $3,000,000.00;'" and that the "financial worth of Mr. Eddy was $2800.00." And the jury were instructed that they might consider the financial wealth and standing of the defendants or the defendant, whom they might find guilty of malice, fraud, oppression, gross negligence, or wilful and wanton disregard of plaintiffs' rights, as a means of determining the amount of such punitive damages as are necessary, by reason of such financial standing, to punish such defendant and deter him from the commitment of like trespasses against others, and that a different amount of punitive damages may be assessed against different defendants, if they should find more thon one of them liable thereto. (See 4th instruction, above quoted.) And they were told by the 5th instruction, also quoted above, that upon deciding to give punitive damages, the amount thereof should be fixed at such sum as they deemed proper, "within the limits of the amount claimed in the petition."

The sum of one dollar only having been assessed against the defendant Eddy for such damages, that is clearly not excessive, and will be understood as not referred to by what may be said in our further discussion of the matter. Nor need the sum assessed against the Hall Oil Company be considered closely, so far as it is complained of by that company on this appeal, for the amount thereof, $1088, is less than the amount assessed against the three defendants jointly as actual damages, and does not apper to us to be so large as to indicate either passion or prejudice. But it must be considered in connection with the amount assessed against

the Midwest company, in the process of ascertaining, to such an extent as we may, the reason or motive for the great difference between that sum and the amount assessed against the Midwest company, $23,928. We think it quite impossible to understand this difference, except upon the theory that the total of the two amounts, approximately $25,000, was fixed as the amount to be assessed for punitive damages, and then divided into the two amounts aforesaid for assessment against the two defendant corporations respectively, computed so as to represent the same proportionate difference as that existing between the maximum wealth of the two defendants; intending thereby that the sum assessed against the wealthier corporation should exceed the amount assessed against the other in the same proportion as its maximum wealth exceeded that of the other. Or that, having first fixed the amount to be assessed against the Hall company, the amount to be assessed against the Midwest was ascertained by multiplication thereof to reach the same result.

But we think any such process of reasoning is not justified by the principle upon which the wealth or financial condition of a defendant in an action of tort may be considered for the purpose of determining the amount of punitive or exemplary damages. Nor has any rule been established, so far as we have observed, authorizing any basis for such discrimination between different defendants equally guilty of a tort justifying the imposition of exemplary damages. The work was done by the Midwest company for the Hall company under the contract aforesaid between them; and when that contract was made the suit had already been commenced against the Hall company to cancel the lease for these lands scheduled in that contract among the lands to be developed thereunder, so that it then knew, as well also by the notice served upon it in July, 1917, that the validity of the lease was questioned by the plaintiffs, claiming it to have been void from the beginning. And in this case, on its answers to interrogatories aforesaid, it acknowledged re-

sponsibility for the entry and the drilling of the well upon the premises. And, for those reasons, we think it should also be held chargeable, the same as the Midwest company, with the statements of the latter's superintendent as to the purpose of going upon the land and the intention to remain there until the well was completed, notwithstanding the protests of the plaintiffs. Donovan v. Consolidated Coal Co., 88 Ill. App. 589; 1 Sedgwick on Damages, 9th Ed., Secs. 380, 380a.

While it is true that the financial condition or wealth of a defendant may be considered in determining the sum to be assessed for exemplary damages, that does not imply a rule of law that in case of two defendants the amounts to be assessed against them respectively may be fixed *solely* with reference to the difference between the respective amounts representing their maximum wealth; nor that the financial culpability of each, as between them respectively and the plaintiffs, is to be measured by the difference between the amounts representing their wealth respectively. We fail to perceive, at least in a case like this, where the actual damages have been fixed at $1200, any good reason for supposing that it would require an assessment of substantially $24,000 damages to deter or prevent future like conduct of a defendant whose wealth may have been shown to have been approximately sixty or seventy millions of dollars, or to be effective as an example to others, and that for the same purpose on assessment of something less than $1100 would be sufficient as against a defendant worth approximately three millions of dollars. It may be assumed, we think, that any individual or corporation worth the smaller amount stated would be able to pay the larger amount of damages here assessed almost if not quite as easily as its wealthier associate. And upon the principle stated in the instructions to the jury that the wealth of said defendants might be considered for the purpose of ascertaining the amount necessary, "by reason of such financial standing," to punish and deter, we fail to comprehend any

reasonable distinction in that respect upon the facts in this case between persons or corporations of such great wealth as that of either of said defendants that might tend to justify or reasonably explain the said discriminative action of the jury, to the extent at least of the amount thereof.

We are therefore forced to the conclusion that the fact of such discrimination alone indicates passion or prejudice on the part of the jury in its assessment of said damages against the Midwest company. But there is a principle fairly well settled by the authorities, though more or less elastic in its application, that indubitably, we think, leads to the same conclusion. And that is, that exemplary damages should bear some reasonable proportion to the amount of the actual damages found to have been sustained, as well as be reasonably commensurate with the nature and cause of the offense. 17 C. J. 995, Sec. 293; 1 Sedgwick on Damages, 9th Ed., Sec. 388; Willis & Bro. v. McNeill, 57 Tex. 465; Tynberg v. Cohen, 76 Tex. 409; 13 S. W. 315; Cotton v. Cooper (Tex. Com. App.) 209 S. W. 135; Mobile & Montgomery R. R. Co. v. Ashcraft, 48 Ala. 33; Rider v. York Haven W. & P. Co., 251 Pa. 18, 95 Atl. 803; Hildreth v. Hancock, 55 Ill. App. 572; Pennington v. Gillaspie, 66 W. Va. 643, 66 S. E. 1009; Harris v. N. Y. Life Ins. Co., 86 W. Va. 681, 104 S. E. 121; Pendleton v. Norfolk & W. Ry. Co., 82 W. Va. 270, 95 S. E. 941; Cotton v. Fisheries Products Co., 181 N. C. 151, 106 S. E. 487; Burkett v. Lanata, 15 La. Ann. 337. That rule, however, is explained in the West Virginia case of Pendleton v. Railway Co. as meaning that the character of the injury should in some degree be considered by the jury in measuring the punishment to be meted out to the defendants, and the court in that case say further:

"This principle is recognized in the administration of criminal laws. It is well known that judges in inflicting punishment always consider the extent of the injury done in determining what punishment will be inflicted upon the de-

fendant. It is true there are other elements that enter into the ascertainment of this character of damages, such as the character and reputation of the parties, their standing in society, and their financial ability. The object of such punishment is to deter the defendants from committing like offenses in the future, and this, it may be said, is one of the objects of all punishment. And we recognize that it would require, perhaps, a larger amount to have this deterrent effect upon one of large means than it would upon one of ordinary means, granting that the same malignant spirit was possessed by each. * * * We are of the opinion that a verdict which awards to a plaintiff nine or ten times as much damages by way of punishment as he is entitled to by way of compensation, in a case in which substantial compensatory damages are awarded, is indicative that the jury were influenced in some improper way in reaching the same, and while it is true that ordinarily the jury will be held to be the judge of what amount should be added as punitive damages, in order to secure adequate punishment in this class of cases, we cannot allow a verdict to stand where the amount thereof is so disproportionate to the amount of actual damages, is so out of harmony with the theory upon which punishments are inflicted for like offenses, that it convinces us that the jury were misguided, to say the least, in returning the same.''

It was explained in the Texas case of Tynberg v. Cohen as meaning that the imposition of heavy exemplary damages where the actual recoverable damages are small, is a fact which ought to be considered to determine whether passion rather than reason dictated the verdict, and the court said:

''Whenever this appears, or is rendered highly probable by contrasting the actual injury with the extent of punishment awarded, looking to all the circumstances of aggravation, new trials should be granted. A power such as may be exercised by juries in awarding exemplary damages is

liable to great abuse, may often lead to great oppression, and there is no class of cases in which the conservation of the judge should more frequently find field for action.  In cases based on facts which merit condemnation or even punishment, though not by law constituting crime, juries, under commendable impulses, but with judgment warped by passion, no doubt often render excessive verdicts, and if it be conceded that such verdicts are to stand because the matter was within the discretion of the jury, then we have an absolutism, a despotism, nowhere else found in our form of government * * * the power to grant new trials where verdicts are evidently excessive, as on other legal grounds, is one firmly and fearlessly to be exercised, and it cannot be surrendered.''

In the Pennsylvania case of Rider v. York Haven W. & P. Co., supra, where the actual damages were assessed at $1000, to which was added $2700 for punitive damages, the court said:

''We know of no case in our own State where punitive damages were allowed in almost treble the amount of the actual damages sustained.  * * *  It is difficult, if not impossible, to lay down any definite rule as to the amount of punitive damages which may be allowed under the facts of a particular case. However, * * * we quite agree with the views expressed by the Supreme Court of Kentucky in Buford v. Hopewell, 140 Ky. 666, where it was said: 'We know no general rule upon the subject of awarding punitive damages except that the damages must not be so excessive as to indicate that the jury was influenced by passion or prejudice, and must have some reasonable relation to the injury and cause of it, and must not be disproportionate to the one or the other.' * * * The learned trial judge evidently * * * felt constrained to sustain the verdict upon the theory that the testimony was sufficient to warrant a finding that the plaintiff had been actually damaged in an amount much larger than the jury found.

We cannot regard this as a sufficient reason for approving an award of punitive damages so disproportionate to the amount of compensatory damages allowed.''

In Cotton v. Cooper, supra, it was said that exemplary damages, being awarded only where actual damages are found, must bear proportion to the actual damages sustained, ''and whether or not so disproportionate is a question of law.'' And, thereupon, it was said further:

''Punitive in character and awarded for the public good, their proportion or ratio to the amount of actual damages recovered must depend upon the state of facts in any given case. The court in Tynberg v. Cohen, supra, declares it the 'duty of the court to carefully determine whether justice between the parties, or the welfare of society, demands the imposition of such a punishment.' ''

Whatever the extent of the rule stated and explained by the authorities just cited, it is very clear, as we have above indicated, that when assessing the amount of punitive or exemplary damages the jury may consider not only the financial condition of the defendant, but in that connection they should also consider the character and the extent of the injury, as well as the character of the act causing the injury, and the matters of aggravation. As stated above, we find in this case no evidence of personal malice or illwill, no act of oppression other than may naturally and usually follow the act of entering upon land with an oil or gas drilling rig and equipment and conducting drilling operations thereon; but that the liability for punitive or exemplary damages arises in the case through legal malice as the result of the unlawfulness of the act over the protest of the plaintiffs.

In addition to the fact that $1200, approximately was deemed sufficient to cover the actual damages, the plaintiffs were left with their land, which, though the actual value is not shown by the evidence, may not have exceeded the

sum of $10,000, even with mineral rights, since it appears that before the service of the notice of July, 1917, upon the Hall Oil Company by the plaintiffs, they had conveyed all their mineral rights in the premises for an agreed compensation of $5000, and had given an option to the purchasers to purchase the fee of the premises at $50 per acre, or a total of $4000. And the plaintiffs were limited upon the trial by the court to damages to the surface and possession; so that all question of injury to or trespass upon mineral rights was withdrawn from consideration. Thus, if we might assume that the value of all the rights of plaintiff, including the fee, aside from mineral rights was worth $9000, the consideration agreed upon for all of said property including the fee, in the instrument selling the mineral rights, the amount of the punitive damages assessed in this case would be nearly three times the value of the entire property, and twenty times the amount of actual damages awarded by the jury; and the amount assessed against the Midwest company alone more than nineteen times the amount of said actual damages.

Although we have held instructions 4 and 5, containing substantially all to be found in the charge explaining the law of punitive or exemplary damages, to be free from technical objection, we think it possible that one or two of the statements therein may have misled or have been misunderstood by the jury, giving them, perhaps, a feeling of justification for their verdict. But we would still not feel warranted in reversing any part of the judgment on the ground of the possible misleading character of the expressions in said instructions to which we shall refer. Nor do we think that the possible effect thereof upon the jury along the line indicated can be regarded as sufficient to overcome the strong indication of passion or prejudice on the part of the jury. As a part of the 4th instruction it is stated that the financial wealth and standing of defendants may be considered as a means of determining the amount of punitive damages necessary ''by reason of such financial

standing, to punish" etc., which might perhaps be understood, though clearly not so intended, as meaning that the *financial standing* of the defendant *was chiefly* or alone to be considered in determining the amount. There was no request for instructions on this subject by the defendants except those already adverted to, declaring that punitive damages were not recoverable in the case at all; and yet, such other instructions might have been proposed, we suppose, in such form as not to waive the claim that the case was not one for punitive damages at all, so that if said statement in the 4th instruction might be deemed too broad or not sufficiently explained to present the matter clearly to the jury, it was rather the fault of counsel for the defense than of the court.

That instruction was given at the request of the plaintiffs, and it was objected to by the defense on the ground, first, that it is not a correct statement of the law relative to punitive damages; second, that the evidence does not warrant such an instruction and is not sufficient to sustain a verdict for such damages; third, that the second paragraph, not containing the expression aforesaid, is misleading; fourth, that in paragraph 4, which, also, does not contain the language above referred to, singles out the defendants and is not a correct statement of the law in reference to punitive damages; and fifth, that the paragraph which does contain the expression aforesaid, assumes that it is necessary to impose punishment upon the defendant or defendants. But the point to which we have called attention is not mentioned in either of the objections dictated into the record, at least in a manner sufficient to inform the court of the point.

Again, the 5th instruction closes with the statement that the amount of punitive damages is to be fixed at such an amount as the jury deem proper "within the limits of the amount claimed in the petition." While it may be customary, with respect to actual damages, or any sum claimed for which the law provides a measure of damages, to recite in an instruction that they may be allowed within the limits

of the amount claimed in the petition, or not beyond the amount so claimed, and though we find in the reports that it is not altogether unusual to so state in an instruction as to punitive damages, still we think the better rule would be to abstain from a recital of that principle in an instruction as to such damages, especially where, as in this case, very large amounts are claimed in the petition, much beyond any possible reasonable expectation of recovery.   The amount claimed for punitive damages in this case was $150,000, and the petition was claiming such damages as well as damages by way of compensation partly for a trespass upon and injury to the mineral rights in the premises, a matter withdrawn from the jury's consideration.  St. L. S. W. Ry. Co. v. Myzell, 87 Ark. 123, 112 S. W. 203; Willis & Bro. v. McNeill, supra; Bryan v. Acee, 27 Ga. 87; Holmes v. Holmes, 64 Ill. 294; Jones v. Turpin, 53 Tenn. (6 Heisk.) 181; 1 Sedg. on Damages, 9th Ed., Sec. 388.

In Ry. Co. v. Myzell, the charge was that "if you find for the plaintiffs, you will assess his damages in any sum not exceeding Five Hundred Dollars, as you may believe from the evidence will compensate him  *  *  *, and further find that  *  *  *  acted wilfully and maliciously when he inflicted the injuries (if any were inflicted), you have the right to give the plaintiff exemplary damages, in addition to compensatory damages, in any sum which you believe proper, not exceeding Fourteen Hundred Dollars." The court stated that the objection was that it told the jury that they might award damages in any sum "not exceeding the respective amounts sued for." And that in so far as it related to compensatory damages it was not objectionable; but that as to exemplary damages it was erroneous.

In Willis & Bro. v. McNeill, 57 Tex. 465, the part of the charge pertinent here was that "you will next inquire whether the same (attachment writ) was maliciously sued out and without probable cause; if you find it was, you will then be authorized to find for the defendant exemplary damages not to exceed $20,000." The court said that while it

is common to use such expressions, and may be said to be authorized by that part of the pleadings in which the plaintiff alleges the amount of his damages, "yet the practice is subject to objection." And further:

"It is a well-known fact that it is the almost invariable rule for the pleader, as a mere matter of form, to place the general allegation of damage at an amount far exceeding any reasonable calculation. When, therefore, the jury are told that, if they find for the plaintiff, they are authorized to give damages not exceeding the amount of formal damages thus alleged in the pleadings, they may take such an expression as an intimation on the part of the court that the petition authorizes a verdict for the full amount claimed. * * * In our practice, the pleadings are always read to the jury, and they are thereby advised of the amount claimed, and if, peradventure, they should now and then exceed this, the error can be easily corrected by a *remittitur.*"

But we are not prepared to hold that said instruction in the respect mentioned was clearly so prejudicial as to require a reversal upon that ground alone. The amount allowed, being so much less than the extravagant claim of the petition, would seem to furnish no substantial ground for assuming that the verdict was necessarily affected by the instruction referring thereto. But if, in any way, it may have influenced the amount of the verdict, a sufficient remedy will, we think, be afforded by the order we shall enter for the disposition of the case here.

It was stated also in the 4th instruction that punitive damages are imposed without regard to and not as a part of actual damages. The words "without regard to" actual damages might be misleading. For in many, if not most, jurisdictions, the rule prevails that punitive damages are not allowable except where some amount of actual damages, at least nominal, are included in the verdict. In other words, that there must have been actual damages to justify a verdict for punitive or exemplary damages. The instruc-

tion probably was intended to mean without regard to the
*amount* of actual damages; at any rate it could not have
been misleading in that respect in this case, for actual dam-
ages were included in the verdict.   But in view of the rule
above discussed requiring the punitive damages to be not
unreasonably disproportionate to the actual damages award-
ed, it may not be correct or proper to say without qualifica-
tion or explanation that punitive or exemplary damages
may be imposed without regard to actual damages.   And
the said instruction may have been misleading in that re-
spect in this case.   We think it better to omit from an in-
struction relative to punitive or exemplary damages, any
statement to the effect that such damages may be allowed or
imposed "without regard to actual damages."

5.   The defendants in error filed herein a cross-petition
in error, alleging that upon the trial of the cause the court
erred in rendering judgment prejudicial to the rights of
defendants in error in that a recovery for certain alleged
matters was denied to them; that competent evidence re-
specting the matter was offered and excluded and that cer-
tain evidence in support of the claim for special damages
was excluded, to their prejudice, and it is prayed that with-
out disturbing the judgment on the issues submitted to the
jury the cause be remanded with directions to hear the
wrongly excluded evidence.   It is sufficient to say in dis-
posing of that, that as held in Johnson v. Golden, Treasur-
er, 6 Wyo. 537, 48 Pac. 196, "the general rule is that an
appellee can reap no advantage from adverse rulings unless
he properly presents them on appeal by properly assign-
ing them as the law and rules of the court direct."   That
was said after referring to our rule requiring as a condition
for consideration here on error of any matter proper to be
presented as a ground for new trial, the presentation thereof
in the trial court by a motion for a new trial, the overruling
of the same, and the reservation of an exception thereto,
all to be shown by a bill of exceptions.   It does not appear

that these defendants in error, plaintiffs below, presented any motion for a new trial in the court below.

6.   Our conclusion is that the amount assessed as puni- tive damages against the Midwest Refining Company is excessive, appearing to have been given under the influence of passion and prejudice, and that the court erred in not granting a new trial upon that ground.   Since the sum awarded for actual damages is imposed upon the three defendants jointly, it would seem proper that if a new trial is to be granted in favor of one defendant it should be granted in favor of all; each having appealed therefor to this court. And it is impossible to say what amount of punitive damages might have been assessed against either if the case had not been submitted on the one trial against the three defendants.   The act complained of as a trespass was the act of all, and whatever may be the rule generally, a matter we have not considered, we think there should be but one recovery of damages in this case.   A new trial may, however, be avoided by a reduction of the amount found to be excessive with the assent of defendants in error expressed by the filing of a remittitur in a sum to be suggested herein.

In view of the character of the trespass, involving more than a mere dispossession of plaintiffs, and temporary injuries naturally capable of complete restoration to a former condition within a short time, and the attitude of these corporation defendants at the time, presenting, if the evidence for plaintiffs is to be believed, an appearance at least of assumed superiority over legal rules and regulations controlling generally the rights of individual property owners and restraining improper interference therewith, relying upon their ability to respond in adequate damages; and considering also their conceded wealth, with the influence and community standing naturally the result thereof, we think the case is one justifying damages, punitive and exemplary, somewhat larger than ordinarily might be sustainable for a trespass upon land of the probable value of the land here

involved and causing the actual damages here found to have been suffered.

Had the total assessment of punitive and exemplary damages not exceeded the sum of $9000 approximately, reasonably distributed between the two corporation defendants, we feel that we would have been strongly disinclined to interfere therewith, though believing that sum to be high, and possibly above the limit of a reasonable allowance. But considering the rule leaving the matter largely in the jury's discretion, without any legal standard of measurement other than that the result must be dictated by reason and not by prejudice and passion, and that here the "test is not what the court would have allowed, but whether the verdict is so large or small as to shock the conscience" (Brause v. Brause, 190 Ia. 329, 177 N. W. 65) we think it might have been our duty to allow an award of the amount last stated to stand. And we are now of the opinion that justice may be done by a reduction of the amount assessed against the Midwest company so as to leave the total amount of such damages at the sum of $9089.

Such reduction can only be ordered upon the filing of a remittitur for the proper amount by the plaintiffs below, defendants in error here. And it will be ordered that if the plaintiffs elect to take a judgment for that amount of punitive and exemplary damages, by filing a remittitur for $15,928 of the amount assessed by the verdict against the Midwets Refining Company, in the office of the Clerk of the District Court within forty five days after the filing of the mandate from this court in that office, then the judgment as against the three defendants as so reduced will stand affirmed. Otherwise, the judgment will be reversed and the cause understood to have been remanded for a new trial. As so reduced, if such remittitur be filed, it will leave the judgment in force for $1250 actual damages against the three defendants, one dollar punitive or exemplary damages against the defendant Eddy, $1088 punitive or exemplary damages against the defendant Hall Oil Company,

and $8000 punitive and exemplary damages against the Midwest Refining Company, as of the date of the original rendition of the judgment.

BLUME, J., and BURGESS, District Judge, concur.